**Nos. 22-15809 & 22-15928**

---

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

Center for Biological Diversity, *et al.*,

*Plaintiffs-Appellants*,

v.

Debra Haaland, in her official capacity as Secretary of the Interior, *et al.*,

*Defendants-Appellees*,

---

On Appeal from the United States District Court for Arizona, Tucson

No. 4:20-cv-00106-RCC

Hon. Raner C. Collins

---

## PLAINTIFFS-APPELLANTS' OPENING BRIEF

---

Heidi McIntosh
Stuart Gillespie
Thomas Delehanty
Earthjustice
633 17th Street, Suite 1600
Denver, CO 80202
(303) 623-9466

*Counsel for Plaintiffs-Appellants Center for Biological Diversity, Grand Canyon Chapter of the Sierra Club, and Maricopa Audubon Society*

**ORAL ARGUMENT REQUESTED**

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Plaintiffs-Appellants Center for Biological Diversity, Grand Canyon Chapter of the Sierra Club, and Maricopa Audubon Society have no parent companies, subsidiaries, or affiliates that have issued shares to the public.

# TABLE OF CONTENTS

STATEMENT OF JURIDICTION ........................................................... 1

STATEMENT OF THE ISSUES .............................................................. 1

STATEMENT OF THE CASE ................................................................. 2

I.     STATUTORY BACKGROUND ................................................... 2

II.    THE SAN PEDRO RIVER ECOSYSTEM ...................................... 6

III.   THE SERVICE'S FLAWED ACCOUNTING MASKED EFFECTS OF THE
       FORT'S INTENSIVE GROUNDWATER PUMPING ...................... 12

IV.    THE NORTHERN MEXICAN GARTERSNAKE ......................... 20

V.     THE SERVICE'S FLAWED CONCLUSION THAT THE FORT'S PUMPING
       WOULD NOT JEOPARDIZE THE GARTERSNAKE .................... 23

VI.    PROCEDURAL POSTURE ...................................................... 25

SUMMARY OF THE ARGUMENT ....................................................... 27

STANDARD OF REVIEW .................................................................. 33

ARGUMENT .................................................................................. 34

I.     THE SERVICE ILLEGALLY CREDITED THE FORT WITH NONEXISTENT
       WATER SAVINGS .............................................................. 34

       A.     The Service Failed to Demonstrate *Whether* Any Pumping
              Was Reasonably Certain to Occur ...................................... 37

1. The property's irrigation infrastructure had been removed ............................................................... 40

2. The property was used for non-irrigation, less water-intensive activities for nearly a decade ............................ 42

3. The region was experiencing a "major trend" of residential development .................................... 45

B. The Service Failed to Demonstrate *How Much* Pumping Was Reasonably Certain to Occur ........................................ 50

C. The Service Failed to Demonstrate *When* Pumping Was Reasonably Certain to Occur ................................................ 52

II. THE SERVICE VIOLATED THE ESA BY ARBITRARILY FINDING THE FORT'S PUMPING WOULD NOT JEOPARDIZE THE GARTERSNAKE ...... 57

A. The Service Improperly Minimized Expected Effects by Comparing Them to Degraded Baseline Conditions ............ 60

B. The Service Failed to Consider Its Findings About the Species' Precarious Status ....................................... 63

CONCLUSION ....................................................... 67

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Bennett v. Spear,*
  520 U.S. 154 (1997) ....................................................................... 46, 49

*Clemente v. United States,*
  766 F.2d 1358 (9th Cir. 1985) ...................................................... 52, 57

*Conner v. Burford,*
  848 F.2d 1441 (9th Cir. 1988) ............................................................. 6

*Copper Valley Mach. Works, Inc. v. Andrus,*
  653 F.2d 595 (D.C. Cir. 1981) .......................................................... 56

*Ctr. for Biological Diversity v. Bernhardt,*
  982 F.3d 723 (9th Cir. 2020) ...................................................... *passim*

*Ctr. for Biological Diversity v. Haaland,*
  2022 WL 2444455 (N.D. Cal. July 5, 2022) ......................................... 4

*Ctr. for Biological Diversity v. Rumsfeld,*
  198 F. Supp. 2d 1139 (D. Ariz. 2002) ............................................... 27

*Ctr. for Biological Diversity v. Salazar,*
  804 F. Supp. 2d 987 (D. Ariz. 2011) ........................................... 27, 50

*Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.,*
  698 F.3d 1101 (9th Cir. 2012) .................................................. 31, 34, 58

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.,*
  441 F. Supp. 3d 843 (D. Ariz. 2020) ................................................ 64

*Gonzalez v. U.S. Immigr. & Customs Enf't,*
  975 F.3d 788 (9th Cir. 2020) ........................................................ 52, 57

*Greater Yellowstone Coal., Inc. v. Servheen,*
  665 F.3d 1015 (9th Cir. 2011) .......................................................... 34

iv

*Humane Soc'y of the U.S. v. Locke,*
626 F.3d 1040 (9th Cir. 2010) ............................................................ 43

*Karuk Tribe of Cal. v. U.S. Forest Serv.,*
681 F.3d 1006 (9th Cir. 2012) ...................................................... 4, 33

*Marsh v. Or. Nat. Res. Council,*
490 U.S. 360 (1989) .......................................................................... 34

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut.*
*Auto. Ins. Co.,*
463 U.S. 29 (1983) ..................................................................... *passim*

*Nat'l Wildlife Fed'n v. Coleman,*
529 F.2d 359 (5th Cir. 1976) ............................................................ 46

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.,*
524 F.3d 917 (9th Cir. 2008) ...................................................... *passim*

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.,*
184 F. Supp. 3d 861 (D. Or. 2016) .............................................. *passim*

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.,*
839 F. Supp. 2d 1117 (D. Or. 2011) ............................................ 36, 38

*Native Fish Soc'y v. Nat'l Marine Fisheries Serv.,*
992 F. Supp. 2d 1095 (D. Or. 2014) .................................................. 36

*Nw. Coal. for Alts. to Pesticides v. EPA,*
544 F.3d 1043 (9th Cir. 2008) .............................................. 39, 41, 43

*Nw. Env't Def. Ctr. v. U.S. Army Corps of Eng'rs,*
2013 WL 1294647 (D. Or. Mar. 27, 2013) ........................................ 46

*Or. Nat. Res. Council Fund v. Goodman,*
505 F.3d 884 (9th Cir. 2007) ............................................................ 33

*Pac. Coast Fed'n of Fishermen's Ass'n v. U.S. Bureau of*
*Reclamation,*
426 F.3d 1082 (9th Cir. 2005) .................................................... 54, 56

*Protect Our Water v. Flowers,*
  377 F. Supp. 2d 844 (E.D. Cal. 2004) ................................................ 48

*Rock Creek All. v. U.S. Fish & Wildlife Serv.,*
  390 F. Supp. 2d 993 (D. Mont. 2005) ........................................... 64, 66

*Rock Creek All. v. U.S. Forest Serv.,*
  703 F. Supp. 2d 1152 (D. Mont. 2010) ................................................ 64

*Save Our Cabinets v. U.S. Fish & Wildlife Serv.,*
  255 F. Supp. 3d 1035 (D. Mont. 2017) ......................................... 36, 64

*Sierra Club v. Marsh,*
  816 F.2d 1376 (9th Cir. 1987) ..................................................... *passim*

*Sw. Ctr. for Biological Diversity v. Perry,*
  No. 94-cv-00598 (D. Ariz. Aug. 30, 1995) ........................................... 27

*Turtle Island Restoration Network v. U.S. Dep't of Com.,*
  878 F.3d 725 (9th Cir. 2017) ........................................... 61, 63, 66, 67

*Tenn. Valley Auth. v. Hill,*
  437 U.S. 153 (1978) .................................................................... 2, 3, 57

*Wild Fish Conservancy v. Irving,*
  221 F. Supp. 3d 1224 (E.D. Wash. 2016) ....................................... 53, 56

*Wild Fish Conservancy v. Salazar,*
  628 F.3d 513 (9th Cir. 2010) ...................................................... *passim*

*Wilderness Soc'y v. Wisely,*
  524 F. Supp. 2d 1285 (D. Colo. 2007) ................................................ 47

## Statutes

5 U.S.C. § 706 ................................................................................ 25, 33

16 U.S.C. § 460xx ................................................................................ 9

16 U.S.C. § 1532 .................................................................................. 3

16 U.S.C. § 1533 .................................................................................. 3

16 U.S.C. § 1536................................................................ 3, 5, 25

28 U.S.C. § 1291.......................................................................... 1

28 U.S.C. § 1331.......................................................................... 1

## Other Authorities

50 C.F.R. § 402.02........................................................... 4, 5, 38

50 C.F.R. § 402.12................................................................. 3, 4

50 C.F.R. § 402.14......................................................... 4, 5, 60

62 Fed. Reg. 665 (Jan. 6, 1997) .............................................. 9

78 Fed. Reg. 41,500 (July 10, 2013)................................. *passim*

78 Fed. Reg. 41,550 (July 10, 2013)................................. *passim*

79 Fed. Reg. 38,678 (July 8, 2014).................................. 20, 21

81 Fed. Reg. 95,316 (Dec. 27, 2016) ................................... 38

86 Fed. Reg. 22,518 (April 28, 2021)................................... 22

Adena R. Rissman, *Evaluating Conservation Effectiveness
    and Adaptation in Dynamic Landscapes,*
    74 L. & Contemp. Probs. 145 (2011) ..................... 39, 45, 46

Fed. R. App. P. 4 ....................................................................... 1

Joel P. Clement et al., *A Strategy for Improving the
    Mitigation Policies and Practices of the Department of the
    Interior: A Report to the Secretary of the Interior from the
    Energy and Climate Change Task Force* (Apr. 2014) ......... 38

U.S. Fish & Wildlife Serv. & Nat'l Marine Fisheries Serv.,
    *Endangered Species Consultation Handbook: Procedures
    for Conducting Consultation and Conference Activities
    under Section 7 of the Endangered Species Act* (1998)........ 38

# GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| BiOp | Biological Opinion |
| ESA | Endangered Species Act |
| PBA | Programmatic Biological Assessment |

## STATEMENT OF JURISDICTION

The district court had federal question jurisdiction, 28 U.S.C. §
1331, because this case challenges the U.S. Fish and Wildlife Service's
Biological Opinion determining that U.S. Army Fort Huachuca's
ongoing groundwater pumping would not jeopardize species listed
under the federal Endangered Species Act.

This Court has jurisdiction under 28 U.S.C. § 1291.  Plaintiffs-
Appellants Center for Biological Diversity, Grand Canyon Chapter of
the Sierra Club, and Maricopa Audubon Society (collectively, the
Conservation Groups) seek review of a final district court order and
judgment granting summary judgment for defendants on the issues
appealed.  Judgment was issued on April 21, 2022.  The Conservation
Groups timely filed their notice of appeal on May 27, 2022.  *See* Fed. R.
App. P. 4(a)(1)(B).

## STATEMENT OF THE ISSUES

1.  Fort Huachuca's groundwater pumping threatens to dry up
the San Pedro River and jeopardize species protected under the
Endangered Species Act (ESA).  The Service nonetheless concluded that
the Fort had offset its pumping and created a groundwater surplus by
simply obtaining a conservation easement on a tract of land.  But the

Service never demonstrated that the easement prevented actual or reasonably certain irrigation from otherwise occurring, as required by the ESA to substantiate the claimed water credits. Did the Service's illusory mitigation violate the ESA, especially where the evidence showed irrigation was uncertain, if not highly unlikely, to occur anyhow?

2.      When rendering a biological opinion, the Service must draw a rational connection between facts found and the conclusion made. The Service determined that the Fort's pumping would dewater habitat deemed essential to the survival and recovery of the northern Mexican gartersnake but would not jeopardize the species. Did the Service violate the ESA by failing to address its findings that this fragile species was vulnerable to the very effects the Fort's pumping would cause?

## STATEMENT OF THE CASE

### I.    STATUTORY BACKGROUND

The Endangered Species Act is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978). It

represents a commitment "to halt and reverse the trend toward species extinction, whatever the cost." *Id.* at 184.

To that end, the Service lists species that are "endangered" or "threatened" and designates their "critical habitat," which are those areas "essential to the conservation of the species." 16 U.S.C. § 1533; *id.* § 1532(5)(A) & (B); *id.* § 1532(3) (defining "conservation" as recovery). Section 7 requires agencies to "[e]nsure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species." 16 U.S.C. § 1536(a)(2).

To comply with this substantive requirement, Section 7 and the implementing regulations impose specific procedural duties upon federal agencies. Before beginning any "major construction activities," the action agency (here, the Fort) must prepare a "biological assessment" to determine whether listed species or critical habitat "are likely to be adversely affected" by the proposed action. 50 C.F.R. §

402.12 (2014).[1]  If so, the action agency must formally consult with the appropriate wildlife agency (here, the Service) before undertaking the action.  50 C.F.R. § 402.14; *see Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1020 (9th Cir. 2012) (en banc).

During the formal consultation process, the Service must formulate a "biological opinion as to whether the action, taken together with cumulative effects, is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat."  50 C.F.R. § 402.14(g)(4).  As part of this "detailed discussion of the effects of the action on listed species or critical habitat," *id.* § 402.14(h)(2), the Service must consider not just a species' survival but also its recovery, *id.* § 402.02 (defining "jeopardize").

Based on the biological opinion, the Service can reach one of three conclusions: (1) that the action will not result in jeopardy or adverse modifications; (2) that the action will cause jeopardy or adverse modification but such jeopardy or adverse modification can be avoided

---

[1] 50 C.F.R. Part 402 was revised after the Fort and Service's consultation, and those revisions were subsequently struck down.  *Ctr. for Biological Diversity v. Haaland*, No. 19-cv-05206-JST, 2022 WL 2444455, at *1 (N.D. Cal. July 5, 2022).  All citations to 50 C.F.R. Part 402 refer to the version in effect during the 2014 consultation process.

4

by implementing reasonable and prudent alternatives to the proposed action as designed; or (3) that jeopardy or adverse modification is unavoidable and thus the action cannot proceed.  50 C.F.R. § 402.14(h)(3).

In reaching these conclusions, the Service must consider "all consequences to listed species or critical habitat" that "would not occur but for the proposed action" and are "reasonably certain to occur."  50 C.F.R. § 402.02 (defining "effects").  This requirement applies to a mitigation measure's purportedly beneficial effects: the Service may consider them only if the beneficial effects would not occur "but for" the mitigation measure and are "reasonably certain to occur."  *Id.*; *Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723, 743 (9th Cir. 2020) [hereinafter *Ctr. for Biological Diversity*].  This ensures that the mitigation measures provide ecological benefits that prevent jeopardy to the listed species.  *Ctr. for Biological Diversity*, 982 F.3d at 743.

Throughout the consultation process, the Service must use "the best scientific and commercial data available."  16 U.S.C. § 1536(a)(2).  To comply with this requirement, the Service "cannot ignore available

biological information." *Conner v. Burford*, 848 F.2d 1441, 1454 (9th Cir. 1988).

## II.   THE SAN PEDRO RIVER ECOSYSTEM

The San Pedro River is one of the last free-flowing rivers in the desert southwest and one of the most ecologically significant perennial undammed desert rivers in the United States.  4-ER-0896; 4-ER-0877.

The San Pedro River flows northward from the Mexican border approximately 200 miles to its confluence with the Gila River in south-central Arizona, providing a ribbon of riparian habitat in an otherwise arid environment.  3-ER-0533.



The San Pedro's reliable flows support a rich ecosystem. At least 355 species of birds have been recorded along the San Pedro River, and between 5 and 10 million migratory songbirds use the San Pedro each year for migration and breeding. 4-ER-0896. The San Pedro also supports 81 species of mammals and 43 species of reptiles and amphibians. 4-ER-0894. In 1995, the American Bird Conservancy recognized the San Pedro River as its first "Globally Important Bird Area" in the United States. 4-ER-0883.

Among the many species that rely on the San Pedro, its year-round flows, and the associated riparian habitat are four species protected under the Endangered Species Act: the western yellow-billed cuckoo, the southwestern willow flycatcher, the Huachuca water umbel, and the northern Mexican gartersnake.


Western yellow-billed cuckoo


Southwestern willow flycatcher



Huachuca water umbel | Northern Mexican gartersnake

Each of these species depends on the San Pedro's water. Western yellow-billed cuckoos require "perennial rivers and streams" like the San Pedro, 2-ER-0322, and "[r]eductions in the vigor or extent of these habitat types will adversely affect the yellow-billed cuckoos that occur there," 2-ER-0329. Similarly, southwestern willow flycatchers rely on "dense riparian habitat near surface water or saturated soil along rivers and streams, reservoirs, cienegas and other wetlands," 3-ER-0580, and large populations of southwestern willow flycatchers are present along the lower San Pedro River, 3-ER-0581. The Huachuca water umbel is a semiaquatic perennial plant that depends on "wetland communities" with "permanently or seasonally saturated highly organic soils," 2-ER-0167, and the San Pedro River is considered the umbel's "most important recovery habitat," 4-ER-0898. The northern Mexican

8

gartersnake is a "riparian obligate," 2-ER-0291, that occupies the San Pedro River and its tributary, the Babocomari River, and is highly sensitive to "activities that . . . reduce flows or dewater habitat" like "groundwater pumping," 2-ER-0299.

The San Pedro River is a critical wildlife refuge in part because so many other desert rivers in the Southwest have been degraded or destroyed. *See* Huachuca Water Umbel Listing Rule, 62 Fed. Reg. 665, 665 (Jan. 6, 1997) (noting that "up to 90 percent of the riparian habitat along Arizona's major desert watercourses has been lost, degraded, or altered"). For example, the nearby Santa Cruz River has experienced complete elimination of riparian vegetation, due in large part to groundwater pumping. 4-ER-0886.

In 1988, Congress recognized the San Pedro's importance when it created the San Pedro Riparian National Conservation Area (SPRNCA). 16 U.S.C. § 460xx. SPRNCA's purpose is "to protect the riparian area and the aquatic, wildlife, archaeological, paleontological, scientific, cultural, educational, and recreational resources of the public lands surrounding the San Pedro River." *Id.* Meeting SPRNCA's

"water needs" is critical to maintaining its riparian habitat and ensuring "its long-term ecological integrity." 4-ER-0889.

The San Pedro's unique, year-round flows depend on many hydrological elements functioning properly together. Surface water in the San Pedro River consists of "stormflow" and "baseflow." 2-ER-0105. Stormflow results from precipitation, and baseflow comes from groundwater seeping into the river from regional and alluvial aquifers. *Id.*

Baseflows, including the San Pedro's, are sensitive to groundwater pumping, which intercepts and removes water that would otherwise flow to the surface. Groundwater pumping in the subwatershed lowers the water table at the well site and creates an underground "cone of depression" by drawing groundwater from surrounding aquifers. This cone gradually expands outward, redirecting the flow away from the river and toward the cone of depression:



4-ER-0885. Due to a basin-wide deficit driven largely by groundwater pumping—with water outflow exceeding natural inflow to the regional aquifer—groundwater levels in parts of the San Pedro River's watershed are declining and groundwater storage is being depleted. 4-ER-0879.

### III. THE SERVICE'S FLAWED ACCOUNTING MASKED EFFECTS OF THE FORT'S INTENSIVE GROUNDWATER PUMPING.

Fort Huachuca is the single largest consumer of groundwater in the Upper San Pedro River Basin. Between 1940 and 2010, it was responsible for pumping approximately 300,000 acre-feet[2] of groundwater. 4-ER-0871. Total Fort-attributable groundwater demand in 2011 was 5,648 acre-feet per year (afy), with demand expected to be as high as 6,000 acre-feet in subsequent years, 2-ER-0059—enough to fill nearly 3,000 Olympic-sized swimming pools every year.

To assess the impacts of removing this enormous volume of water from the ecosystem, the Fort completed a Programmatic Biological Assessment (PBA). 3-ER-0454. Based on those findings, the Fort initiated ESA Section 7 consultation with the Service in 2013 regarding the effects of its pumping for the years 2014 to 2024. 4-ER-0811–13. The Service issued a Biological Opinion (BiOp) concluding that the Fort's groundwater pumping in that period was not likely to jeopardize

---

[2] One acre-foot is equivalent to 326,000 gallons, or enough water to cover an acre of land (about the size of a football field) one foot deep.

the survival or recovery of listed species.  2-ER-0200 (umbel); 2-ER-0312 (gartersnake); 3-ER-0344 (cuckoo).[3]

Underlying the Service's no-jeopardy findings was its claim that the Fort's operations would create a "mathematically anticipated . . . net groundwater surplus" from 2014 onwards, allegedly benefitting the San Pedro River ecosystem and its endangered species.  2-ER-0195.  A necessary piece of this alleged surplus came from water credits associated with a conservation easement the Fort obtained in late 2013 on the Preserve Petrified Forest property, a 480-acre parcel located in Cochise County, Arizona (previously named the Three Millers/Palominas parcel).  2-ER-0069.  The Service justified the water credits based on the claim that the Fort's acquisition of the property and purported retirement of irrigation generated 2,588 afy of water "savings."  *Id.*  This, it found, turned the Fort's net groundwater deficit into a purported net surplus beginning in 2014:

---

[3] The Army concluded that its pumping "would have no effect" on the southwestern willow flycatcher and its critical habitat and therefore did not consult with the Service regarding that species.  4-ER-0642–43.

Table 10. Summary of Projected Net Groundwater Demands (values in acre-feet)

| | Actuals | | Forecasts (based on average values) | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
| Total Fort Huachuca Groundwater Demand | -5,648 | -5,446 | -6,000 | -6,000 | -6,000 | -6,000 | -6,000 | -6,000 | -6,000 | -6,000 | -6,000 | -6,000 |
| Incidental Recharge (septic, urban enhanced golf course return flows) | 1,482 | 1,450 | 1,450 | 1,450 | 1,450 | 1,450 | 1,450 | 1,450 | 1,450 | 1,450 | 1,450 | 1,450 |
| Completed Mitigation Measures | | | | | | | | | | | | |
| Fort Huachuca Water Conservation Efforts (C1) | Water savings reflected in reduced Fort Attributable Demand above | | | | | | | | | | | |
| Stormwater Capture(C2) | 13 | 32 | 108 | 108 | 108 | 108 | 108 | 108 | 108 | 108 | 108 | 108 |
| East Range Recharge (C3) | 256 | 269 | 368 | 368 | 368 | 368 | 368 | 368 | 368 | 368 | 368 | 368 |
| EOP Recharge (C4) | 1,072 | 995 | 1,034 | 1,034 | 1,034 | 1,034 | 1,034 | 1,034 | 1,034 | 1,034 | 1,034 | 1,034 |
| Babocomari Conservation Easements (C5) | 299 | 299 | 299 | 299 | 299 | 299 | 299 | 299 | 299 | 299 | 299 | 299 |
| Clinton and Drijvers Conservation Easements (C6) | 1,073 | 1,073 | 1,073 | 1,073 | 1,073 | 1,073 | 1,073 | 1,073 | 1,073 | 1,073 | 1,073 | 1,073 |
| River Stone Ranch Conservation Easements (C7) | 0 | 0 | 149 | 149 | 149 | 149 | 149 | 149 | 149 | 149 | 149 | 149 |
| Mansker Conservation Easement(C8) | 0 | 0 | 24 | 24 | 24 | 24 | 24 | 24 | 24 | 24 | 24 | 24 |
| Bella Vista Ranch (Sierra Vista Area) Conservation Easement (C9) | 0 | 0 | 0 | 238 | 238 | 238 | 238 | 238 | 238 | 238 | 238 | 238 |
| Preserve Petrified Forest (Palominas Area) Conservation Easement (C10) | 0 | 0 | 0 | 2,588 | 2,588 | 2,588 | 2,588 | 2,588 | 2,588 | 2,588 | 2,588 | 2,588 |
| In-progress Mitigation Measures | | | | | | | | | | | | |
| Huachuca City Effluent (F1) | 0 | 0 | 0 | 88 | 88 | 88 | 88 | 88 | 88 | 88 | 88 | 88 |
| Palominas Pilot Stormwater Recharge Project (F2) | 0 | 0 | 0 | 0 | 98 | 98 | 98 | 98 | 98 | 98 | 98 | 98 |
| Planned Mitigation Measures | | | | | | | | | | | | |
| Future Babocomari Conservation Easements (P1) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 248 |
| Projected Net Groundwater Demand/Surplus | -1,453 | -1,180 | -1,495 | 1,419 | 1,517 | 1,517 | 1,517 | 1,517 | 1,517 | 1,517 | 1,517 | 1,765 |

4-ER-0732 (highlights added); *see also* 2-ER-0205.

The Service repeatedly relied on this alleged surplus to offset adverse impacts to listed species. For example, it concluded that the Fort's pumping would not jeopardize the Huachuca water umbel because a "relatively large magnitude of net groundwater surplus"—attributable to the Petrified Forest easement—would "ensure [that] the adverse effects" of the Fort's pumping would "be of short duration, and more than completely ameliorated." 2-ER-0197. Similarly, it concluded that the Fort's pumping would not jeopardize the Huachuca water umbel because there would be "a net surplus in the groundwater demand accounting" beginning in 2014. 2-ER-0331. And it concluded

14

the Fort's pumping would not impair the gartersnake's recovery because the Fort would "hav[e] a 'positive' water budget balance beginning in 2014." 2-ER-0313. Without the easement, the Fort would be liable for a groundwater deficit of roughly 1,000 afy. *See* 4-ER-0732; 2-ER-0205.

However, the Petrified Forest easement did not confer ecological benefits to the San Pedro's listed species. It did not retire an active water use because irrigation had been discontinued on the property nearly a *decade* before the easement was conferred. 4-ER-0759 ("[A]gricultural pumping [on the property] ceased in 2005."); *see also* 4-ER-0869 ("[P]umping [on the property] ceased after 2004."). So the Service instead based the water credits on its assumption that the easement prevented *future* irrigation. 2-ER-0069.

It attempted to justify this approach by asserting that "nothing precluded" future irrigation from occurring. *Id.* The Service emphasized that the property had previously been used for alfalfa irrigation and claimed that "the entire irrigation infrastructure remain[ed] in place" on the property. *Id.* In reality, though, the property's irrigation center pivots were "no longer present." 4-ER-0843;

15

*see also* 4-ER-0848 (documenting "*former* pivot system pads" on the property) (emphasis added).  Indeed, one of the wells' "distribution system[s]" had been "excavated."  4-ER-0866.  The only activity known to have occurred on the property in the near-decade since irrigation had ceased was cattle grazing, with no irrigation.  4-ER-0843; 4-ER-0848.

Moreover, the "major trend" in the region was not agricultural irrigation, but rather the exact opposite: "increased development that [was] simply urbanizing the formerly rural landscape."  4-ER-0881.  Demand for "second homes, retirement communities and an 'exurban' or 'small-town' lifestyle" had increased population growth and housing in areas that were formerly rural in character.  *Id.*  That demand was driving new development through "planned communities, subdivisions, and lot splits."  *Id.*  In fact, the Fort identified "lot splitting"—new residential development occurring on individual parcels—as a "substantially increasing" trend in the area.  *Id.*

Consistent with that residential trend, one quarter-section of the Preserve Petrified property was platted as a 42-parcel residential subdivision known as Rancho Arizona.  4-ER-0842.  Subsequently, in 2014, Cochise County purchased the other three quarter-sections of the

16

Petrified Forest property to split the lot and allow for the development of twelve large (40-acre) residential homes. 2-ER-0069; 4-ER-0814 ("There will be 12 homes allowed under the easement because the land could not be split to less than 40 acre parcels."). These facts—which run contrary to the Service's assertions and were never considered in the BiOp—show that pumping for irrigation was unlikely to occur on the Petrified Forest property, with or without the easement.

The Service's calculation of the magnitude of the easement's purported benefits was also flawed. To calculate the alleged savings, the Service multiplied the "water duty" for irrigating alfalfa and other crops—5.4 afy per acre—by the acreage on the property that was previously irrigated for alfalfa—480 acres. 2-ER-0069. The Service determined the acreage value based on "four circle-pivot fields" of 120 acres, each of which was located in its own quarter-section. *Id.* The Service granted the Fort water credit for retiring all 480 acres. *Id.*

The property's deed, however, excluded "the southwest quarter thereof." 4-ER-0840. In fact, the deed already reflected the 42-parcel Rancho Arizona development on the southwest quarter section:

17



4-ER-0835. This planned development demonstrated that the

southwest section was excluded from the easement. The Service

therefore overstated the easement's (theoretical) benefits by, at minimum, 648 afy (120 acres x 5.4 afy per acre).[4]

The Service's assumption of the timing of the easement's purported benefits was also flawed. The Service acknowledged the "uncertainty in when agricultural pumping would recommence without the easement." 2-ER-0192–93; *see also* 4-ER-0759. Tellingly, based on that uncertainty, the Fort did not include avoided future pumping on the Petrified Forest Parcel in its groundwater modeling. 2-ER-0192–93. Yet the Service granted the Fort with 2,588 afy of immediate water "savings" for offsetting hypothetical future agricultural irrigation starting in 2014, 2-ER-0205, just weeks after the easement was conveyed on November 20, 2013. 4-ER-0817.

---

[4] The Service also failed to account for "return flows" when calculating the Petrified Forest easement's purported benefits. To calculate the total (theoretical) groundwater use, the Service multiplied the property's acreage by 5.4 afy per acre—the "water duty" for irrigating alfalfa. 4-ER-0733. The water duty, however, far exceeds the "consumptive use" of the crop, 4-ER-0891, and irrigation in excess of the consumptive use "returns to the aquifer." 4-ER-0890. The Service calculated a total water duty of 2,592 afy for the Petrified Forest property's (theoretical) future irrigation but failed to subtract out approximately 960 afy that would have become return flows that recharged the aquifer. *See* 4-ER-0892.

## IV. THE NORTHERN MEXICAN GARTERSNAKE

As noted above, one of the species that relies on the San Pedro River ecosystem is the northern Mexican gartersnake, which the Service listed as threatened in 2014. Final Northern Mexican Gartersnake and Narrow-headed Gartersnake Listing Rule, 79 Fed. Reg. 38,678 (July 8, 2014).



The presence of water is critical to sustain the gartersnake and its prey base, and reductions in streamflow cause negative impacts to the species and its habitat. 2-ER-0299–300. Indeed, "[o]f all the activities that may threaten [the gartersnake's] physical habitat, none are more

20

serious than those that reduce flows or dewater habitat over large reaches or locally." 2-ER-0299. Dewatering activities like the Fort's groundwater pumping "seriously threaten[s] the physical habitat of the gartersnakes, because both fish and amphibians must have water to survive and reproduce and without this prey base, gartersnakes cannot persist." 79 Fed. Reg. at 38,702.

Largely because of continued dewatering, northern Mexican gartersnake populations have declined precipitously over time. When the Service issued its BiOp, the species had already been reduced mostly to small, scattered, low-density populations, with only 5 of 29 "known localities" (17 percent) considered viable. 2-ER-0293. Extensive "dewatered zones" caused populations to become "disconnected and isolated," and, as a result, any further "population declines or extirpations" cause "a reduction in species redundancy and resiliency." Proposed Northern Mexican Gartersnake and Narrow-headed Gartersnake Listing Rule, 78 Fed. Reg. 41,500, 41,536, 41,539–40 (July 10, 2013). Various threats to the gartersnake, but especially actions that "alter or dewater" habitat, *id.* at 41,536, act "synergistically" and "disproportionately" on "low-density gartersnake

21

populations," *id.* at 41,540. As a result, local populations' reduction or loss "ultimately enhances the risk of [the species] becoming endangered or going extinct." *Id.* at 41,536.

The species' plight makes the gartersnake vulnerable to even small ecological harms. "[I]n the absence of appropriate recruitment"— meaning additions to the adult population—the loss of "even a few adults, or even a single adult female" gartersnake can drive a low-density population "to extirpation." *Id.* at 41,536.

Along the San Pedro and Babocomari Rivers, gartersnakes exist only in "low densities." 2-ER-0310. Because of ongoing loss of suitable habitat and the species' precarious status, the San Pedro and lower Babocomari Rivers were designated as critical habitat and determined to be "essential for the conservation of the species." Proposed Northern Mexican Gartersnake Critical Habitat Designation, 78 Fed. Reg. 41,550, 41,568 (July 10, 2013); Final Northern Mexican Gartersnake Critical Habitat Designation, 86 Fed. Reg. 22,518 (Apr. 28, 2021).[5]

---

[5] The BiOp incorporated the northern Mexican gartersnake proposed listing rule and proposed critical habitat designation rule by reference. 2-ER-0293.

## V. THE SERVICE'S FLAWED CONCLUSION THAT THE FORT'S PUMPING WOULD NOT JEOPARDIZE THE GARTERSNAKE

The Service determined that the Fort's groundwater pumping was not likely to jeopardize the survival or recovery of the northern Mexican gartersnake. 2-ER-0312–13.

The BiOp acknowledged that the Fort's pumping would reduce baseflows in the lower Babocomari River. 2-ER-0308. It found that this would make flows "too slight or temporarily disappear" and thereby "reduce the foraging area" in that stretch of river. 2-ER-0310. This dewatering, it found, would "concentrate harmful nonnative predators resulting in greater predation pressure on resident snakes." *Id.* As a result, the BiOp concluded that the Fort's pumping would cause "local recruitment to be very low." *Id.* The Service also issued an Incidental Take Statement because it "anticipate[d]" that this "concentration and seasonal removal of wetted habitat" would result in the "direct mortality, injury, or harassment" of 10 northern Mexican gartersnakes. 2-ER-0314.

Nonetheless, the BiOp asserted that the Fort's groundwater pumping would positively impact the San Pedro River and benefit the gartersnake. 2-ER-0313. It based this conclusion partly on its

mistaken belief that mitigation measures like the Petrified Forest easement would create "a 'positive' water budget balance beginning in 2014," and "reduce the effect of impacts" to the gartersnake. *Id.* The BiOp also assumed there would be no adverse effects to the gartersnake because individuals impacted by the anticipated dewatering would "either move upstream into more suitable reaches of the Babocomari River (~10 km) or . . . move downstream into the San Pedro River in search of more suitable foraging habitat." 2-ER-0310–11. In its proposed critical habitat designation, however, the Service noted studies finding that individual gartersnakes wandered only "hundreds of meters away from water" when faced with "a decline or disappearance of the prey base" and documenting gartersnake presence "at a distance of [only] 330 ft (100 m) away from permanent water." 78 Fed. Reg. at 41,554. The no-jeopardy discussion did not reconcile or explain the conflict between the BiOp's stated expectation that the gartersnake would move *ten thousand* meters in search of suitable habitat and the critical habitat rule's documentation of gartersnakes moving only *hundreds* of meters in search of suitable habitat. *Id.*

24

The BiOp also asserted that the expected harms from the Fort's pumping would be "limited," "small," and "minim[al]." 2-ER-0313. It based this conclusion on the species' degraded status, noting that the local populations existed at "low densities" and were in "poor condition." *Id.*; 2-ER-0310. However, the Service's explanation of its no-jeopardy conclusion never mentioned the earlier findings that genetic isolation between the species' scattered, low-density, isolated populations made the gartersnake vulnerable to even small, localized impacts. *See* 2-ER-0310–11.

## VI. PROCEDURAL POSTURE

In the proceedings below, as relevant here, the Conservation Groups challenged the Service's 2014 BiOp under the Administrative Procedure Act (APA), 5 U.S.C. § 706, asserting that the Service violated Section 7 of the Endangered Species Act (ESA), 16 U.S.C. § 1536. The Conservation Groups moved for summary judgment on all their claims, and the government Defendants cross-moved for summary judgment. After oral argument, the district court granted in part and denied in part each party's motion.

25

The district court held in the Conservation Groups' favor on one issue. It held that the Service "ignore[d] one half of the equation" when it failed to subtract "return flows"—the water that irrigated crops do not consume and that naturally flows back to the aquifer—from its calculation of the Petrified Forest easement's purported benefit. 1-ER-0030–32.[6] While the district court remanded the BiOp with instructions to address this single, narrow issue, it did not vacate the BiOp, *see* 1-ER-0036–37, and the Fort continues to rely on the BiOp to claim that its ongoing groundwater pumping does not jeopardize listed species.

On the Conservation Groups' remaining claims, the district court either held in the Defendants' favor or neglected to address the claim. Two of those issues are appealed here: (1) the Conservation Group's claim that the Service acted arbitrarily and capriciously by granting the Fort immediate water savings of 2,588 afy for its easement on the Petrified Forest property; and (2) the Conservation Group's claim that

---

[6] The district court also granted in part the Conservation Groups' motion to complete the administrative record including two documents relevant here: the Preserve Petrified Forest Easement Report and the Preserve Petrified Forest Deed of Perpetual Conservation Easement. 1-ER-0036.

26

that the Service acted arbitrarily and capriciously by determining that the Fort's groundwater pumping would not jeopardize the northern Mexican gartersnake's survival or recovery.

## SUMMARY OF THE ARGUMENT

A true ecological treasure, the San Pedro River ecosystem and its many endangered and threatened species have long suffered the impacts of the Fort's groundwater pumping.[7]  Stretches of the river are now drying up, threatening the survival of this renowned ecosystem. Nonetheless, the Fort continues to extract nearly 3,000 Olympic swimming pools' worth of water from the watershed every year, placing species at risk of jeopardy.  In its latest biological opinion assessing this

---

[7] *See Sw. Ctr. for Biological Diversity v. Perry*, No. 94-cv-00598 (D. Ariz. Aug. 30, 1995) at 21–22 (finding the Army must not "turn a blind eye" to the "unrestrained draining of the aquifer" that was threatening the San Pedro River nor "to the fact that its actions may tend to exacerbate it") (quoted in *Ctr. for Biological Diversity v. Rumsfeld*, 198 F. Supp. 2d 1139, 1144 (D. Ariz. 2002); *Rumsfeld*, 198 F. Supp. 2d at 1153, 1156 (setting aside a biological opinion prepared by the Service in 1999 because the Service "attempted to sidestep[] its obligation to make an accurate 'no jeopardy' decision" by relying on the Fort's future commitment to identify measures to mitigate its groundwater pumping); *Ctr. for Biological Diversity v. Salazar*, 804 F. Supp. 2d 987, 1010 (D. Ariz. 2011) (finding the Service's 2007 biological opinion failed to properly analyze the Fort's effects on species' recovery and relied on mitigation measures that were "not reasonably specific nor reasonably certain to occur").

pumping, the Service violated its obligations under the Endangered Species Act and Administrative Procedure Act in two ways.

**First**, the Service failed to demonstrate that the Fort's proposed mitigation—namely, purchase of the Petrified Forest easement—provided "reasonably certain" ecological benefits that "address[ed] the threats to the species in a way that satisfies the jeopardy and adverse modification standards." *Ctr. for Biological Diversity*, 982 F.3d at 743. The Service credited the Fort with 2,588 afy of water savings for acquiring the easement but never demonstrated that agricultural irrigation was reasonably certain to occur on the property absent the easement. To the contrary, the Service simply assumed that agricultural irrigation *might* occur on the property at some future time and claimed a massive water credit for purportedly preventing that hypothetical use. But that speculation ran contrary to the evidence in the record, which demonstrated future irrigation was not just uncertain, but highly unlikely to occur. The Service ignored this evidence and, as a result, violated its obligations under the ESA.

Specifically, the Service did not rationally assess *whether*, *how much*, or *when* irrigation was "reasonably certain" to occur on the

property absent the easement. Regarding *whether*, it is undisputed that the Petrified Forest easement did not retire an active water use: irrigation had ceased nearly a decade prior. 4-ER-0759; 4-ER-0869. Given that, the easement could mitigate the Fort's pumping only by "preclud[ing] future increases in water use." 2-ER-0332.

But the Service offered no evidence that future irrigation would occur on the property without the easement. It did not identify any imminent plans by anyone to irrigate the property for agriculture. Instead, it assumed that irrigation would occur simply because "nothing precluded" it and because irrigation infrastructure remained "entire[ly]" on the property. 2-ER-0069. That assertion was patently wrong: a critical part of the infrastructure had in fact been removed long prior. 4-ER-0843; 4-ER-0866. The Service did not consider that contrary fact. Nor did it consider evidence that the property was already being used for conflicting, less-water-intensive uses that required no irrigation. 4-ER-0843. Compounding that error, the Service ignored evidence that the property was likely to be used for residential development, which was a "major trend" in the region, 4-ER-0881, and would have used far less water.

29

Nonetheless, the district court upheld the Service's flawed approach. It did so by impermissibly relying on post-hoc arguments raised for the first time in court and concluding that some water use was "possib[le]," "potential," or "reasonably likely." 1-ER-0027. But that falls short of the ESA's standard, which requires proof of "reasonably certain" water uses so as to ensure the easement provides the necessary biological benefits: actual water savings. *Ctr. for Biological Diversity*, 982 F.3d at 743.

Regarding *how much*, the Service relied again on mistaken facts and conjecture to assign water credits totaling 2,588 afy. The Service committed clear error by granting the Fort credit for preventing agricultural irrigation on the entire Petrified Forest property, when the easement covered only three-quarters of the property. 4-ER-0833. This caused the Service to overstate the easement's (theoretical) water credits by at least 846 afy. The district court did not address this error.

Regarding *when*, the Service credited the Fort with immediate water savings beginning in 2014, 4-ER-0732; 2-ER-0205, just weeks after the easement was recorded on November 20, 2013. 4-ER-0817. But the BiOp offers no support for the Service's assumption that

30

irrigation was reasonably certain to begin on January 1, 2014, or any other specific day. In fact, the Service conceded in other parts of the BiOp that such a determination would be entirely speculative. 2-ER-0192–93. The district court did not address this error.

If allowed, the Service's approach would permit a project proponent to claim virtually unlimited water savings for obtaining an easement on any tract of land—even where that easement did not prevent any water uses from otherwise occurring. Such illusory mitigation turns the ESA on its head, forcing species, rather than project proponents, to bear the risk of uncertain or inadequate mitigation measures. This Court should not allow that result, which risks jeopardy to listed species.

***Second***, the Service failed to articulate a "rational connection between the facts found and the choice made" when it concluded that the Fort's pumping would not jeopardize the northern Mexican gartersnake's survival or recovery. *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 698 F.3d 1101, 1121 (9th Cir. 2012) [hereinafter *CBD v. BLM*]; *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, at 43 (1983).

31

The Service found that the gartersnake had been reduced mostly to small, scattered, low-density populations and that any further population declines made the species vulnerable to extinction. 78 Fed. Reg. at 41,536–44. It also found that, "in the absence of appropriate recruitment, the loss of even a few adults, or even a single adult female" could drive a low-density population "to extirpation." *Id.* at 41,536. And it found that the Fort's pumping was expected to reduce baseflows in the lower Babocomari River, destroy foraging habitat, cause "local recruitment to be very low," and result in the take of 10 gartersnakes, 2-ER-0310; 2-ER-0314—all in an area deemed "essential" to the species' survival and recovery. 78 Fed. Reg. at 41,568.

Rather than articulating a rational connection between these facts and its no-jeopardy conclusion, the Service's BiOp dismissed the expected impacts as "small" and "minim[al]." 2-ER-0313. In doing so, the Service unlawfully ignored its own findings about the importance of maintaining all northern Mexican gartersnake populations, including low-density ones. *See Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 529 (9th Cir. 2010). And it improperly minimized the Fort's impacts by contrasting them with the gartersnake's already-degraded baseline,

32

rather than evaluating the effects in combination with the baseline. *See Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 930 (9th Cir. 2008) [hereinafter *National Wildlife Federation*]. If allowed, this approach would cause the gartersnake to "be gradually destroyed, so long as each step on the path to destruction is sufficiently modest"—a "slow slide into oblivion [that] is one of the very ills the ESA seeks to prevent." *Id.*

The district court did not address this issue. This Court should reverse and remand for the Service to address this additional error.

## STANDARD OF REVIEW

The district court's award of summary judgment is reviewed de novo. *E.g.*, *Or. Nat. Res. Council Fund v. Goodman*, 505 F.3d 884, 888–89 (9th Cir. 2007).

The APA governs the Court's review of agency decisions under the ESA. *Karuk Tribe,* 681 F.3d 1017. Under section 706 of the APA, the reviewing court must determine whether the Service's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency action is arbitrary and capricious if the agency has

relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*CBD v. BLM*, 698 F.3d at 1109 (quoting *State Farm*, 463 U.S. at 43).

In reviewing agency action under this standard, courts must undertake a "searching and careful" review of the administrative record. *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989). The reviewing court must also "ensure that the agency considered the relevant factors and articulated a rational connection between the facts found and the choices made." *Greater Yellowstone Coal., Inc. v. Servheen*, 665 F.3d 1015, 1023 (9th Cir. 2011).

## ARGUMENT

### I. THE SERVICE ILLEGALLY CREDITED THE FORT WITH NONEXISTENT WATER SAVINGS.

The Service found that even though the Fort pumps nearly 6,000 afy of groundwater every year, its groundwater depletion would nonetheless have a net positive effect on the San Pedro River's baseflows. The Service based this counterfactual conclusion on a critical but wholly illusory mitigation measure: the Fort's acquisition of the Preserve Petrified Forest conservation easement. For that

34

easement—and its purported prevention of irrigation on the property—the Service erroneously credited the Fort with 2,588 afy of water savings. Without those water savings, the Fort's claim that it would create "a net surplus" in groundwater demand, with corresponding "positive" impacts to baseflows, BiOp at 158, is mathematically impossible. *See* 4-ER-0732 (showing a roughly 1,000-acre-foot deficit each year without the Petrified Forest easement).

The fatal flaw with the Service's approach is that the purported water savings were not "reasonably certain" to occur, as the ESA requires. *Ctr. for Biological Diversity*, 982 F.3d at 743. This Court has made clear that mitigation measures like the Petrified Forest easement "must constitute a clear, definite commitment of resources, and be under agency control or otherwise reasonably certain to occur." *Id.* (internal quotation marks omitted). Furthermore, and "most important, they must address the threats to the species in a way that satisfies the jeopardy and adverse modification standards." *Id.* (internal quotation marks omitted). The Service was therefore required

to demonstrate that the ecological benefits of the mitigation—the purported water savings—were reasonably certain to occur. *Id.*[8]

The Service failed to meet that burden here. As an initial matter, it is undisputed that the Petrified Forest easement did not retire an active water use: irrigation had ceased on the property nearly a decade before being placed into easement. 4-ER-0759. The Service "acknowledge[d]" that "conservation easements do not result in an increase in flows in adjoining streams unless an active water use is retired." 2-ER-0332. So, as the Service conceded, the easement could mitigate the Fort's pumping only by "preclud[ing] future increases in water use." *Id.*

---

[8] *See also Save Our Cabinets v. U.S. Fish and Wildlife Serv.*, 255 F. Supp. 3d 1035, 1063 (D. Mont. 2017) (finding a BiOp unlawful due to "potential inadequacy" of an already-implemented measure's efficacy in reducing species mortality); *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 184 F. Supp. 3d 861, 903–06 (D. Or. 2016) [hereinafter *NWF v. NMFS II*] (concluding that mitigation measures, even if implemented, did not satisfy the ESA due to "layers of uncertainty in predicting benefits from habitat improvement"); *Native Fish Soc'y v. Nat'l Marine Fisheries Serv.*, 992 F. Supp. 2d 1095, 1113–14 (D. Or. 2014) (finding a BiOp unlawful when it did not demonstrate that certain measures "would mitigate the problems" even though they were "certain to be implemented"); *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 839 F. Supp. 2d 1117, 1126 (D. Or. 2011) [hereinafter *NWF v. NMFS I*] (noting that mitigation measures must be both "feasible and effective").

Yet, the Service never demonstrated future irrigation was reasonably certain to occur. Instead, it granted the Fort 2,588 afy of immediate water credits based only on its speculative claim that "nothing precluded" future irrigation without the easement. 2-ER-0069. But the ESA prohibits such bare speculation, especially when, as here, it also runs contrary to the evidence in the record. The Service's approach—with no support for *whether*, *how much*, or *when* future irrigation would occur—places the risk of inadequate mitigation not on Fort Huachuca but on the listed species that depend on the San Pedro River's flows for their survival. That outcome fails to ensure that the Fort's ongoing pumping does not jeopardize species, as required by the ESA.

The district court erroneously accepted the Service's unlawful approach only by relying on post-hoc rationales found nowhere in the BiOp and misapplying the relevant legal standard.

### A. The Service Failed to Demonstrate *Whether* Any Pumping Was Reasonably Certain to Occur.

If the Service relies on a conservation easement to claim credit for retiring a future water use, it must demonstrate that, absent the easement, the future water use was reasonably certain to occur. *Ctr. for*

*Biological Diversity*, 982 F.3d at 743; *National Wildlife Federation*, 524 F.3d at 936; *see also* 50 C.F.R. § 402.02 (defining "effects" as "consequence[s]" that "would not occur but for the proposed action," including its mitigation measures). Otherwise, the purported savings are not reasonably certain to provide the "necessary biological response." *NWF v. NMFS I*, 839 F. Supp. 2d at 1125. This requirement reflects the axiom that a mitigation measure confers no biological value unless it adds benefits beyond what would happen anyway.[9] *Cf. Sierra Club v. Marsh*, 816 F.2d 1376, 1380–81 (9th Cir. 1987) (evaluating mitigation measures conserving land that was actively proposed for

---

[9] This concept is known as "additionality" and is a core tenet of the Interior Department's mitigation guidance. *See Endangered Species Act Compensatory Mitigation Policy*, 81 Fed. Reg. 95,316, 95,339 (Dec. 27, 2016) ("Compensatory mitigation must provide benefits beyond those that would otherwise have occurred."); Joel P. Clement et al., *A Strategy for Improving the Mitigation Policies and Practices of the Department of the Interior: A Report to the Secretary of the Interior from the Energy and Climate Change Task Force* 6 (Apr. 2014), https://tinyurl.com/y366dkm4; ("[T]he beneficial effects of compensatory mitigation must be additional to what would otherwise have occurred."); U.S. Fish & Wildlife Serv. & Nat'l Marine Fisheries Serv., *Endangered Species Consultation Handbook: Procedures for Conducting Consultation and Conference Activities under Section 7 of the Endangered Species Act* 4-19 (1998), https://tinyurl.com/hfapjknn; (explaining that one appropriate form of mitigation might be acquiring "degraded habitat" and "improv[ing]" it, but that the "beneficial effects of the conservation measure are irrelevant" if such habitat were "only protect[ed]").

development); *see also, e.g.*, Adena R. Rissman, *Evaluating Conservation Effectiveness and Adaptation in Dynamic Landscapes*, 74 L. & Contemp. Probs. 145, 146 (2011) ("In order to have positive environmental impacts, [a] conservation easement[] must result in environmental benefits in addition to what would have occurred without [it] in place."); 2-ER-0332 (observing that an easement could mitigate the Fort's pumping only by "preclud[ing] future increases in water use").[10]

A BiOp's conclusions—including any determination of a mitigation measure's benefits—must be "rationally supported" and "complete, reasoned, and adequately explained." *NWF v. NMFS II*, 184 F. Supp. 3d at 909–10 (quoting *Nw. Coal. for Alts. to Pesticides v. EPA*, 544 F.3d 1043, 1052 n.7 (9th Cir. 2008)). A reviewing court must assess the reasons given at the time of the agency's decision; post-hoc litigation arguments cannot suffice. *State Farm*, 463 U.S. at 50 ("[A]n agency's

---

[10] The Service also noted that, even if an easement precludes future water use, it does so only by "ensur[ing] that water uses do not grow as *quickly* or to as great a *magnitude* as they would absent the easements," BiOp at 294 (emphasis added), i.e., the "how much" and "when" pieces discussed in Parts I.B and I.C, *infra*.

action must be upheld, if at all, on the basis articulated by the agency itself.").

The Service did not—and, indeed, could not—satisfy its ESA obligations here, for three reasons: (1) the facts squarely refuted the Service's incorrect claimed that irrigation infrastructure remained in place on the property; (2) the Petrified Forest property had been used for non-irrigation purposes for years; and (3) the Service ignored evidence showing that the property was likely be developed for residential use, not irrigation.

### 1. The property's irrigation infrastructure had been removed.

The Service pointed to past irrigation on the Petrified Forest property as a basis for speculating that it would be irrigated in the future. Specifically, it noted "previous agricultural activity" in the form of "four circle-pivot fields planted in alfalfa." 2-ER-0069. The Service claimed that the property could be irrigated in the future because "the entire irrigation infrastructure remain[ed] in place" on the property and "nothing precluded" future irrigation. *Id.*

But the BiOp neglected to mention that a vital piece of that infrastructure, the center pivot sprinklers, had in fact been removed. 4-

40

ER-0843. One of the wells' "distribution system[s]" had also been "excavated." 4-ER-0866. These contrary facts do not appear in the BiOp, rendering it "[in]complete, [un]reasoned, and [in]adequately explained." *NWF v. NMFS II*, 184 F. Supp. 3d at 909–10; *Nw. Coal.*, 544 F.3d at 1052 n.7.

In the proceedings below, Defendants' counsel did not even attempt to defend the BiOp's inaccurate statement that "the entire irrigation infrastructure remain[ed] in place." 2-ER-0069. Instead, it offered post-hoc arguments, asserting that the missing center-pivot sprinklers were "an ordinary business expense" and that alfalfa could simply be "flood irrigated." Defs.' Cross-Mot. for Summ. J. (XMSJ), at 25 n.14 (district court ECF No. 25). These arguments are impermissible as they appear nowhere in the BiOp. In fact, they contradict the BiOp's reasoning, which based the assignment of water credits on prior alfalfa irrigation in "circle-pivot fields" and irrigation infrastructure remaining "entire[ly]" in place, 2-ER-0069—an assertion that was patently wrong.

Nonetheless, the district court accepted the government's post-hoc litigating position, finding "the status of the center pivots" to be "non-

dispositive because alfalfa and other crops do not require center pivot irrigation." 1-ER-0026 (citing the Service's brief). This was error. The court may not, on its own, fill in the gaps in the agency's analysis, which was premised explicitly on center-pivot irrigation. *See State Farm*, 463 U.S. at 43 ("We may not supply a reasoned basis for the agency's action that the agency itself has not given."). Instead, it must remand to the agency to provide the reasoned basis required by the law and ensure compliance with the ESA. *Id.* at 57 (remanding to agency to provide a reasoned basis for its decision).

## 2. The property was used for non-irrigation, less water-intensive activities for nearly a decade.

The Service also failed to consider conflicting uses of the property that required far less water than irrigation. The BiOp did not acknowledge that alfalfa irrigation had been discontinued 9 years earlier in 2005 and that, in that time, "perennial grasses and many weed species . . . replaced the alfalfa previously grown on the property." 4-ER-0842. Nor did the Service acknowledge that the only recent activity on the property was grazing that did not involve irrigation. 4-ER-0843. Thus, the BiOp failed to account for facts directly contrary to its stated rationale, again making it "[in]complete, [un]reasoned, and

42

[in]adequately explained." *NWF v. NMFS II*, 184 F. Supp. 3d at 909–10; *Nw. Coal.*, 544 F.3d at 1052 n.7.

In the proceedings below, the Service asserted for the first time that the BiOp needed to demonstrate only that "any" form of "agricultural use," such as grazing, could have occurred on the property to justify its assumption of future agricultural *irrigation*. XMSJ at 25. In making that argument, the Service conceded that the property's history demonstrated only "the *potential* use of the property for a *variety* of agricultural uses." XMSJ at 24 (emphasis added). This post-hoc argument directly contradicts the BiOp, which premised its grant of water credits not on "a variety of" or "any" agricultural use, *id.* at 24–25, but on irrigation for "agricultural crops," and specifically alfalfa. 2-ER-0069.

In fact, the Service's post-hoc litigation position "serve[s] only to underscore the absence of an adequate explanation in the administrative record itself" for claiming a massive water credit. *Humane Soc'y of the U.S. v. Locke*, 626 F.3d 1040, 1050 (9th Cir. 2010). The argument conflates distinct uses, suggesting that alfalfa irrigation and grazing use can be treated interchangeably for the purposes of

43

quantifying water credits. But there are significant differences between these agricultural uses: "stock watering," for example, XMSJ at 25 n.14, requires water on the order of gallons per year, not thousands of acre-feet per year as claimed by the Service. In fact, grazing use does not even qualify for a water duty due to its "relative insignificance." 4-ER-0902. It was thus irrational for the Service to claim a massive water credit for agricultural irrigation, absent proof that that specific use was reasonably certain to occur.

The district court nonetheless accepted the Service's newfound justification, finding that the possibility of "grazing" or "agricultural water use" demonstrated a likelihood[11] of "agricultural irrigation":

> Because the Agencies looked at historic use of the land for agricultural irrigation, the land's ability to again be used in this manner, the fact the [Petrified Forest] easement was leased and occupied for *agricultural grazing use*, and sale of the [Petrified Forest] easement prevented the possibility of *agricultural water use* indefinitely, Defendants have shown that future agricultural *irrigation* was reasonably likely to occur.

---

[11] As discussed in Part I.A.3, *infra*, this rationale also conflates "reasonably certain" with "reasonably likely," a standalone basis for reversal.

44

1-ER-0027 (emphasis added). The district court's reliance on this rationale—which is not only flawed but also appears nowhere in the BiOp—was error. *See State Farm*, 463 U.S. at 50.

### 3. The region was experiencing a "major trend" of residential development.

Furthermore, the Service ignored contrary record evidence that future irrigation was *not* likely to occur. As documented by the Fort, Cochise County was experiencing a "major trend" of "increased development that [was] simply urbanizing the formerly rural landscape." 4-ER-0881. Consistent with that trend, one quarter of the Petrified Forest property had already been subdivided for residential development, as discussed in greater detail in Part I.B, *infra*. Furthermore, the remainder of the proper was zoned and ultimately purchased with residential development rights. 2-ER-0069; 4-ER-0814. These unexamined facts directly contradict the Service's conjecture that the property would be used for water-intensive agricultural irrigation.

Nor did the Service undertake its own analysis of development trends in the area. For example, it did not analyze agricultural use patterns on comparable properties and assess the likelihood of irrigation activity on the Petrified Forest property. *See* Rissman, *supra*,

45

at 149 (discussing methods for assessing "what would likely happen without the conservation easement—the counterfactual"—such as "comparative analysis" of "paired landscapes"); *contra, e.g.*, *Nw. Env't Def. Ctr. v. U.S. Army Corps of Eng'rs*, No. 3:10-cv-01129-AC, 2013 WL 1294647, at *24 (D. Or. Mar. 27, 2013) (finding "the efficacy" of certain mitigation measures was adequate when there was "evidence in the record that the conservation measures w[ould] in fact result in habitat improvement"); *Nat'l Wildlife Fed'n v. Coleman*, 529 F.2d 359, 373–74 (5th Cir. 1976) (holding that a private development was a reasonably certain effect of a major highway based on evidence showing that "private development always accompanies the construction of a major highway").

Instead, it relied on rank speculation, reasoning that irrigation *would* occur simply because it (theoretically) *could*—and ignoring contrary evidence in the process. Such *ipse dixit* reasoning violates the ESA and APA's requirement of reasoned decisionmaking. *See Bennett v. Spear*, 520 U.S. 154, 176 (1997) (explaining that an agency cannot avoid jeopardy "on the basis of speculation or surmise").

46

The Service's illogic highlights the mitigation measure's shortfall. As this Court and others have emphasized, mitigation must ensure that a project's known harms are offset by equivalently certain benefits. *See Marsh*, 816 F.2d at 1386 n.13 ("It is certain that this project will harm the birds' environment; what is uncertain is whether the harm will be mitigated."); *Wilderness Soc'y v. Wisely*, 524 F. Supp. 2d 1285, 1306 (D. Colo. 2007) ("As the lessee's plans become more specific . . . the degree to which the [agency] must specify its mitigation measures rises as well."). But here, there is a mismatch between the certain, known harm from the Fort's ongoing pumping and the uncertain (at best) benefits of preventing hypothetical pumping on the Petrified Forest property. This imbalance upsets the very purpose of mitigation: ensuring against jeopardy to species from the Fort's known, certain, adverse impacts.

The district court nonetheless upheld the Service's flawed approach by flatly misapplying the ESA's standard. The court correctly noted that the Service was required to provide "clear and substantial information" that the easement's purported "result"—avoided irrigation—was "reasonably certain to occur." 1-ER-0026–27. Yet the court then departed from that standard by applying a "reasonably

likely" standard and concluding that preventing "the possibility of" a

"potential" agricultural use[12] satisfied the ESA:

> Because . . . sale of the [Petrified Forest] easement prevented *the possibility of* agricultural water use indefinitely, Defendants have shown that future agricultural irrigation was *reasonably likely* to occur and the determination that the [Petrified Forest] easement purchase retired a *potential* agricultural irrigation use was not arbitrary and capricious.

1-ER-0027 (emphasis added).

The district court did *not* (and on this record, could not) find that

future irrigation—and therefore the prevention of irrigation—was

"reasonably certain." *Ctr. for Biological Diversity*, 982 F.3d at 743; *see

also, e.g.*, *Protect Our Water v. Flowers*, 377 F. Supp. 2d 844, 881 (E.D.

Cal. 2004) (finding the Service failed to demonstrate a result was

"reasonably certain" by showing it "likely w[ould] result").[13]  This was a

clear misapplication of the law that undermines the protections

---

[12] As discussed in Sections I.A.1 and I.A.2, *supra*, the district court improperly relied on post-hoc arguments regarding what kind of use might theoretically occur, an additional error that warrants reversal.

[13] Notably, the district court ruled against the Conservation Groups on a separate issue not appealed here by holding that effects of future pumping were not "*reasonably certain to occur*" even though the pumping was "likely to continue."  1-ER-0022.  Holding the Conservation Groups to the reasonable certainty standard there further illustrates the district court's error here.

afforded by the Endangered Species Act and forces species to bear the risk of uncertainty—exactly what this Court has forbidden. *Marsh*, 816 F.2d at 1386 (holding that any uncertainties in mitigation "must be borne by the project, not by the endangered species").

At bottom, the Service ignored contrary evidence to conclude that irrigation would resume simply because "nothing precluded" it. 2-ER-0069. If allowed, the Service's approach would render mitigation an empty exercise by allowing federal agencies to circumvent jeopardy based on uncertain, if not entirely nonexistent, water savings. That approach fails to ensure against jeopardy to species, which is the Service's fundamental obligation under the ESA. Unsurprisingly, courts have barred agencies from relying on such illusory mitigation to justify projects that, like this one, concretely harm protected species. *See Marsh*, 816 F.2d at 1386; *Bennett*, 520 U.S. at 176.

Because the Service failed to show that the Petrified Forest easement prevented *any* reasonably certain future irrigation, this Court should reverse.

## B. The Service Failed to Demonstrate *How Much* Pumping Was Reasonably Certain to Occur.

Even if the easement conferred some benefit (which the record does not support), the Service failed provide a rational explanation why 2,588 afy of water credits accurately reflects the easement's impact. The Service's failure to support a quantification of a mitigation measure's benefits violates the ESA. *See Salazar*, 804 F. Supp. 2d at 1002 (finding a prior Fort Huachuca BiOp unlawful because it failed to justify and support "the amount of water the conservation measures would save"); *NWF v. NMFS II*, 184 F. Supp. 3d at 904–05 (holding that the Service arbitrarily overlooked "the significant uncertainties with estimating specific survival benefits from habitat mitigation actions").

However, the Service made a critical error regarding the amount of water savings the Petrified Forest parcel could theoretically produce: it wrongly assumed that the easement covered the whole property, when it actually covered only three quarters.[14]  As this Court has held, a mitigation measure does not satisfy the ESA if requisite property

---

[14] The Service also mis-quantified the easement's potential benefits by failing to subtract "return flows" from avoided irrigation—an error the district court correctly struck down.  1-ER-0030–32.  The Conservation Groups do not appeal that portion of the district court's decision.

50

rights are lost or diminished. *Marsh*, 816 F.2d at 1380–81, 1385–86 (finding that acquiring and preserving 188 acres of marsh land would not satisfy the ESA's reasonable certainty standard if they were encumbered with seven easements that "would reduce or eliminate" the conservation benefit).

According to the BiOp, the Service granted the Fort credit for obtaining "a conservation easement on a parcel close to and west of the San Pedro River near Palominas on which about 480 ac[res] of alfalfa were grown." 2-ER-0069. That long-discontinued agricultural irrigation consisted of "four circle-pivot fields," each of which was located in its own 160-acre quarter section. *Id.* "Each field [consisted] of 120 ac[res] for a total of 480 irrigated acres" of alfalfa. *Id.* The Service granted the Fort water credit for retiring all 480 acres. *Id.*

The property's deed, however, shows that the conservation easement did not cover all four quarter sections that were previously irrigated on the parcel. Rather, the deed expressly excluded "the southwest quarter thereof." 4-ER-0833. In fact, the deed shows that, at the time the easement was made, the southwest quarter section was *already platted* as a 42-parcel subdivision. 4-ER-0835. This planned

development, known as Rancho Arizona, 4-ER-0842, demonstrated that the southwest section was excluded from the easement and that the Service should not have given the Fort mitigation credits for retiring irrigation on the 120-acre tract in that quarter section.

This error led the Service to overstate the water credit on the Preserve Petrified Forest by 846 afy, according to its own formula: 120 acres x 5.4 acre-feet per acre. 2-ER-0069. Thus, fully a quarter of the purported savings are unfounded, and thus arbitrary and capricious. *See Marsh*, 816 F.2d at 1385–86.

The district court did not address this key issue—an error that warrants reversal. *E.g.*, *Gonzalez v. U.S. Immigr. & Customs Enf't*, 975 F.3d 788, 822–23 (9th Cir. 2020) (reversing district court for failing to address a key issue); *Clemente v. United States*, 766 F.2d 1358, 1366 (9th Cir. 1985) (same).

### C. The Service Failed to Demonstrate *When* Pumping Was Reasonably Certain to Occur.

Even if the Petrified Forest easement prevented some amount of water use, the Service erred by assuming these (hypothetical) benefits would accrue instantly. The Service credited the Fort with immediate water savings, beginning just weeks after the ink dried on the

easement's recordation deed. *See* 4-ER-0817 (easement recordation deed dated November 20, 2013); 4-ER-0732 (crediting the Fort with 2,588 acre-feet of water credits for the entire calendar year 2014); 2-ER-0205 (same). By the agencies' math, those credits moved the Fort from a net *deficit* of 1,495 acre-feet in 2013 to a net *surplus* of 1,419 acre-feet in 2014, the moment the calendar flipped. 4-ER-0732; 2-ER-0205. Yet there is no evidence in the record that the easement prevented imminent irrigation from occurring, as would be required for the purported benefits to accrue almost instantaneously.

The ESA bars the Service from calculating benefits as "instantaneously accruing" if those benefits may in fact "take years to achieve." *NWF v. NMFS II*, 184 F. Supp. 3d at 906 (finding such an approach "fails to give the 'benefit of the doubt' to the listed species") (quoting *Marsh*, 816 F.2d at 1386). Instead, the Service must "discount the benefit of future improvements in its jeopardy analysis if multiple generational cycles may occur before the improvements will be made." *Wild Fish Conservancy v. Irving*, 221 F. Supp. 3d 1224, 1232 (E.D. Wash. 2016). That is because "[i]t is not enough to provide water for [a species] to survive in [many] years, if in the meantime, the population

has been weakened or destroyed by inadequate water flows." *Pac.
Coast Fed'n of Fishermen's Ass'n v. U.S. Bureau of Reclamation*, 426
F.3d 1082, 1095 (9th Cir. 2005).

Here, the Service failed to demonstrate when the easement would
generate water savings, much less that those savings were immediate,
making its approach wholly unsupported and scientifically flawed.
First, neither the BiOp nor the administrative record contains any
support for the assumption that alfalfa irrigation was reasonably
certain to begin on November 20, 2013, January 1, 2014, or any other
specific day. This total lack of support alone renders the BiOp's claim of
instantaneous savings arbitrary, capricious, and contrary to the ESA.
*See State Farm*, 463 U.S. at 44 (1983) (holding that an agency's findings
must be supported by "substantial evidence on the record").

Second, the record is rife with statements that such a
determination would be entirely speculative. Discussing the Fort's
groundwater effects model, the Service expressly found that "[i]t is not
feasible to model conservation easements due to uncertainty in
estimating precisely where and *when* future development would occur . .
. or *when* agricultural pumping would recommence." 2-ER-0332

(emphasis added); *see also* 2-ER-0192–93.  Similarly, the Fort's PBA

noted that conservation easements could not be included in its

groundwater model "[d]ue to the uncertainty in the timing of future

avoided pumping."  4-ER-0758.  The PBA also stated that the Petrified

Forest easement specifically was not included in the groundwater model

"[d]ue to uncertainties of when the pumping might recommence without

the conservation easement."  4-ER-0759; *see also* 4-ER-0735.  These

unambiguous statements about avoided pumping's uncertain timing

completely undermine the Service's decision to assign immediate water

credits starting on January 1, 2014.

Furthermore, even if the Service knew when irrigation was

reasonably certain to begin, the benefits of preventing that irrigation

would still take years or decades to affect the San Pedro.  Elsewhere in

the BiOp, the Service acknowledged the existence of a "time lag"

between pumping and aquifer effects and cautioned that it could not

determine how long it would take before easements' purported "water

savings overt[ook] the negative influence of Fort Huachuca's water

demands' on baseflows."  2-ER-0195.  Similarly, the Fort noted that the

easements' benefits "may not be realized at the rivers for several years

or even decades." 4-ER-0733–34. Yet the Service inexplicably ignored its own provisos by assigning immediate water credits for the Petrified Forest easement—a case study in arbitrary decisionmaking. *Copper Valley Mach. Works, Inc. v. Andrus*, 653 F.2d 595, 607 (D.C. Cir. 1981) ("Affording different treatment to similar situations is the essence of arbitrary action.").

This failure to account for the lag in the easement's purported benefits undermines the Service's no-jeopardy determinations. Without immediate credit for 2,588 afy of water beginning in 2014, the Fort's pumping would have created more than 1,000 afy of net groundwater deficit for years, even by the agencies' math. 4-ER-0732; 2-ER-0205. That deficit would cause listed species to go through "multiple generational cycles" before the easement's benefits (if any) were felt. *Irving*, 221 F. Supp. 3d at 1232. "[I]n the meantime," the species' populations could be "weakened or destroyed by inadequate water flows." *Pac. Coast Fed'n*, 426 F.3d at 1095. The Service dodged its duty to assess this possibility with its unfounded presumption of immediate benefit.

By failing to account for these uncertainties, the Service placed all the risk of inadequate mitigation on the species. This is precisely what the ESA does not permit. *See, e.g.*, *Tenn. Valley Auth.*, 437 U.S. at 194 ("Congress has spoken in the plainest of words, making it abundantly clear that the balance has been struck in favor of affording endangered species the highest of priorities, thereby adopting a policy which it described as 'institutionalized caution.'"); *Marsh*, 816 F.2d at 1376, 1386 (noting that the "benefit of the doubt" must be given to the endangered species and that the risk of failure of mitigation must fall on the project). In short, the Service violated the ESA when it treated the Petrified Forest easement's recordation as the switch to a floodgate that instantaneously released 2,588 afy of water into the San Pedro River ecosystem, an assumption the agency knew was pure fiction.

As noted, the district court did not address this key flaw, warranting reversal of its decision. *E.g.*, *Gonzalez*, 975 F.3d at 822–23; *Clemente*, 766 F.2d at 1366.

## II. THE SERVICE VIOLATED THE ESA BY ARBITRARILY FINDING THE FORT'S PUMPING WOULD NOT JEOPARDIZE THE GARTERSNAKE.

The Service committed a second critical error. It failed to explain why the Fort's pumping would not jeopardize the northern Mexican

57

gartersnake's survival or recovery when that pumping was expected to reduce baseflows in the lower Babocomari River, destroy foraging habitat, and impede the local population's sustainment and growth. The district court opinion did not address this issue and should be reversed.

When making a jeopardy determination, the Service must articulate a "rational connection between the facts found and the choice made." *CBD v. BLM*, 698 F.3d at 1121; *State Farm*, 463 U.S. at 43. This requires assessing how both survival and recovery are impacted by "the aggregate of the proposed agency action, the environmental baseline, cumulative effects, and current status of the species." *National Wildlife Federation*, 524 F.3d at 926.

The Service failed to do so here. As noted, the Service found that the Fort's pumping would reduce baseflows in the lower Babocomari River. 2-ER-0308–10. This reduction was expected to: make flows "too slight or temporarily disappear" and thereby "reduce the foraging area" in that stretch of river; "concentrate harmful nonnative predators resulting in greater predation pressure on resident snakes"; and, critically, cause "local recruitment"—additions to the adult population—

58

"to be very low." 2-ER-0310. The BiOp also "anticipate[d]" that this "concentration and seasonal removal of wetted habitat" would result in the "direct mortality, injury, or harassment" of 10 northern Mexican gartersnakes. 2-ER-0314.

In dismissing these expected impacts, the Service erred in three ways. First, it claimed that mitigation measures like the Petrified Forest easement would contribute to "a 'positive' water budget balance beginning in 2014" and "reduce the effect of impacts" to the gartersnake. 2-ER-0313. This irrational assumption is addressed in Section I, *supra*: paper water credits, with no assessment of whether, how much, or when they result in real ecological changes, do not ensure the gartersnake's survival or recovery.

Second, the Service surmised that affected gartersnakes could simply "move" "~10 km" away "in search of more suitable foraging habitat." 2-ER-0310–11. But the Service offered no scientific support for that assumption. In fact, it previously found that, "in response to a decline or disappearance of the prey base," northern Mexican gartersnakes were observed "wandering" only "hundreds of meters" from water. 78 Fed. Reg. at 41,554; *id.* at 41,557 (noting gartersnake

59

typically stay "within 600 ft (182.9 m) of permanent water"). The Service did not reconcile its "belie[f]" that gartersnakes would flee 10,000 meters with its findings that they had been documented moving only hundreds of meters from water—two orders of magnitude less.

Third, it claimed that the expected impacts would be "minimize[d]" due to the affected population's low density. 2-ER-0313. Its conclusion on this point violated the ESA in two ways. First, the Service unlawfully contrasted the expected impacts against the gartersnake's degraded baseline conditions, rather than evaluating the effects and baseline in combination. Second, the Service failed to account for its own findings that small impacts—including the loss of even a single adult female gartersnake—could have significant species-level effects.

### A. The Service Improperly Minimized Expected Effects by Comparing Them to Degraded Baseline Conditions.

The ESA requires that a project's harms be analyzed in combination with, not in contrast to, baseline conditions. *See* 50 C.F.R. § 402.14(g)(4) (requiring the Service to determine jeopardy by "[a]dd[ing] the effects of the action . . . to the environmental baseline").

This Court explained the requirement in *National Wildlife Federation*, where it held that a BiOp violated the ESA by evaluating the effects of an action as "compared to" rather than "added to" baseline conditions. 524 F.3d at 929–30. The Court reasoned that failure to sum new effects with baseline conditions would allow "a listed species [to] be gradually destroyed, so long as each step on the path to destruction is sufficiently modest"—a "slow slide into oblivion [that] is one of the very ills the ESA seeks to prevent." *Id.* at 930. As a result, "where baseline conditions already jeopardize a species, an agency may not take action that deepens the jeopardy by causing additional harm." *Id.* at 930.

This Court has repeatedly affirmed that requirement. In *Turtle Island Restoration Network v. U.S. Department of Commerce*, the Court rejected NMFS's claim that a proposed action's removal of a single female loggerhead sea turtle per year made "little to no difference" given the species' already dire condition. 878 F.3d 725, 737 (9th Cir. 2017). This approach, the Court held, "improperly minimized" impacts to the loggerhead's survival and recovery "by only comparing the effects of the fishery against the baseline conditions that have already contributed to the turtles' decline." *Id.* at 738. In *Wild Fish*, the Court

rejected the Service's conclusion that proposed dam operations would "contribute" to the bull trout's survival by "improv[ing] upstream passage conditions" relative to the prior 70 years of baseline, because the net effect was nonetheless a continued population decline. 628 F.3d at 525–29. In short, the Service must factor baseline conditions into a jeopardy determination, not use them as a point of comparison to downplay adverse impacts.

The Service violated that requirement here. It repeatedly characterized impacts from the Fort's baseflow reductions as "limited," "small," and "minim[al]" *due to* the local populations' "low densities" and "poor condition." 2-ER-0310; 2-ER-0313. It stressed that "northern Mexican gartersnake populations along the Babocomari and San Pedro River are thought to be in poor condition and likely not viable in the long-term" due to other threats like "competitive and predation pressure from harmful nonnative species." 2-ER-0310. And it observed that these threats would keep the populations "at low to very low densities along these two streams." *Id.* But rather than evaluating how these degraded conditions *plus* the Fort's pumping would impact the lower Babocomari River gartersnake population, the Service

62

explicitly based its no-jeopardy finding on its view that the populations'
low density "minimize[d] the total number of individuals that c[ould] be
adversely affected by the proposed action." 2-ER-0313.

This minimization-by-comparison violates the ESA and warrants
reversal. *National Wildlife Federation*, 524 F.3d at 929–30; *Turtle
Island*, 878 F.3d at 738; *Wild Fish*, 628 F.3d at 526–28.

## B. The Service Failed to Consider Its Findings About the Species' Precarious Status.

The Service also did not address its findings that even small
impacts to low-density gartersnake populations can have significant
species-level effects. The ESA requires that such findings be accounted
for. *Wild Fish*, 628 F.3d at 528–29.

For example, in *Wild Fish*, this Court rejected a no-jeopardy
finding where a hatchery project was expected to prevent the
"demographic and genetic contributions" of migrant fish to Icicle Creek,
a small but important population of threatened bull trout. *Id.* at 526.
The Court observed that "[t]he Service might . . . have found that even if
the Icicle Creek bull trout population were extirpated, its loss would not
jeopardize the survival or recovery" of the species. *Id.* at 529. But it
rejected that possibility because the Service had found that the

63

population was "important": the recovery unit as a whole was "generally

declining" and "strong in only 6 to 24 percent of the occupied range"; the

regional population was a "relative stronghold" for bull trout; and the

Icicle Creek population had the potential to serve a "buffer function"

from ecological disturbances.  *Id.*  It was therefore "far from obvious

that the extirpation of the Icicle Creek population would be harmless."

*Id.*[15]

---

[15] District courts have reached similar conclusions.  *E.g.*, *Rock Creek All. v. U.S. Fish & Wildlife Serv.*, 390 F. Supp. 2d 993, 1000, 1010 (D. Mont. 2005) (striking down a BiOp's no-jeopardy conclusion where a project was likely to impact a bull trout subpopulation and the Service had made previous findings indicating that loss of "any subpopulation of bull trout" could have species-level effects); *cf. Rock Creek All. v. U.S. Forest Serv.*, 703 F. Supp. 2d 1152, 1205 (D. Mont. 2010) (upholding a no-jeopardy conclusion where the Service acknowledged prior findings about subpopulations' importance but relied on an updated and "expanded review of the current status of the species across its range" to conclude that local extirpation was unlikely and would not have meaningful impacts if it did occur); *see Save Our Cabinets*, 255 F. Supp. 3d at 1047–51 (discussing the *Rock Creek* and *Wild Fish* decisions and finding a BiOp unlawful where impacts were expected to be "significant" and "permanent," and the subpopulation was "essential"); C*tr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 441 F. Supp. 3d 843, 858–59 (D. Ariz. 2020) (finding the Service was required to identify a "tipping point" for the northern Mexican gartersnake's survival and recovery when a mine was expected to impact a "uniquely important" piece of habitat).

Similarly, the Service here found that *every* remaining gartersnake population was important. It found that the species had been reduced mostly to small, scattered, low-density populations, and that any further population declines made the species vulnerable to extinction. Specifically, it found that only 5 of 29 "known localities" (17 percent) were viable, 2-ER-0293, and that, due to "dewatered zones" causing populations to become "disconnected and isolated," any further "population declines or extirpations" would cause "a reduction in species redundancy and resiliency." 78 Fed. Reg. at 41,536, 41,539–40. It noted that all threats to the gartersnake, and especially actions that "alter or dewater" habitat, *id.* at 41,536, were acting "synergistically" and "disproportionately" on "low-density gartersnake populations," *id.* at 41,540. And the Service expressly found that local populations' reduction or loss "ultimately enhance[d] the risk of [the species] becoming endangered or going extinct." *Id.* at 41,536.

The Service also identified the Babocomari River specifically as "essential for the conservation of the species." 78 Fed. Reg. at 41,568.

These findings made it "far from obvious" that the extirpation of the lower Babocomari River population "would be harmless." *Wild Fish*,

65

628 F.3d at 529; *see Rock Creek*, 390 F. Supp. 2d at 1000 (noting similar statements about all subpopulations' importance).

Moreover, the Service's factual findings suggested that local extirpation was a real possibility. The Service cautioned that, "in the absence of appropriate recruitment," the loss of "even a few adults, or even a single adult female" could drive a low-density population "to extirpation." 78 Fed. Reg. at 41,536. Yet the BiOp predicted the Fort's pumping would do precisely that: cause "local recruitment to be very low" and result in the take of 10 gartersnakes along the lower Babocomari River. 2-ER-0310; 2-ER-0314. These findings made it entirely possible that the Fort's pumping would extirpate gartersnakes in an area deemed essential to the species, undermining its no-jeopardy conclusion. *See Wild Fish*, 628 F.3d at 528 (rejecting the Service's no-jeopardy finding where the Icicle Creek population required "at least a few pairs" of spawning migratory bull trout, but the action "would likely preclude *any* spawning by migratory bull trout in some years"); *Turtle Island*, 878 F.3d at 737 (rejecting agency's claim that the loss of a single adult female loggerhead turtle would not be significant).

66

In short, the Service simply assumed without support that impacts to this precarious population would not harm the species as a whole, ignoring its own findings to the contrary. That approach short-shrifts a species teetering on the brink of extinction and inverts the ESA's most basic goal of protecting species most in need of protection. The Service surely may not skirt its duties because a species is *more* at risk. *Turtle Island*, 878 F.3d at 737; *National Wildlife Federation*, 524 F.3d at 929–30; *Wild Fish*, 628 F.3d at 528. That would be giving up, which the ESA does not allow.

## CONCLUSION

For the reasons above, the Court should declare the Service's 2014 BiOp to be arbitrary, capricious, and in violation of the ESA, and reverse and remand for the agency to correct its errors.

Respectfully submitted September 6, 2022.

*/s/ Stuart Gillespie*
Stuart Gillespie
Heidi McIntosh
Thomas Delehanty
Earthjustice
633 17th Street, Suite 1600
Denver, CO 80202
Phone: (303) 623-9466
Fax: (720) 550-5757
sgillespie@earthjustice.org

67

hmcintosh@earthjustice.org
tdelehanty@earthjustice.org

*Counsel for Plaintiffs-Appellants*
*Center for Biological Diversity,*
*Grand Canyon Chapter of the*
*Sierra Club, and Maricopa*
*Audubon Society*

## STATEMENT OF RELATED CASES

The following case relates to this appeal under Circuit Rule 28-2.6: *Center for Biological Diversity v. Haaland,* No. 22-15928 (federal Defendants' consolidated cross-appeal from the district court merits ruling in this case).

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** _____22-15809 & 22-15928_____

I am the attorney or self-represented party.

**This brief contains 12,136 words,** excluding the items exempted

by Fed. R. App. P. 32(f) and Fed. R. App. P. 28.1-1(e). The brief's type size

and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[**x**] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**        *Rev. 12/01/18*

[  ] is accompanied by a motion to file a longer brief pursuant to Cir. R.
     32-2(a).

**Signature**  _/s/ Stuart Gillespie_____  **Date** _9/6/22_____
(use "s/[typed name]" to sign electronically-filed documents)

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**                                                         *Rev. 12/01/18*