No. 22-15809

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

Center for Biological Diversity, *et al.*,

*Plaintiffs-Appellants*,

v.

Debra Haaland, in her official capacity as Secretary of the Interior, *et al.*,

*Defendants-Appellees*,

On Appeal from the United States District Court for Arizona, Tucson

No. 4:20-cv-00106-RCC

Hon. Raner C. Collins

## PLAINTIFFS-APPELLANTS' REPLY BRIEF

Heidi McIntosh
Stuart Gillespie
Thomas Delehanty
Earthjustice
633 17th Street, Suite 1600
Denver, CO  80202
(303) 623-9466

*Counsel for Plaintiffs-Appellants Center for Biological Diversity, Grand Canyon Chapter of the Sierra Club, and Maricopa Audubon Society*

## ORAL ARGUMENT REQUESTED

# TABLE OF CONTENTS

I. THE SERVICE ERRED BY IRRATIONALLY ASSUMING THAT THE FORT WOULD GENERATE A GROUNDWATER SURPLUS. ................................. 2

    A. The Service Relied on the Groundwater Demand Accounting to Reach Its No-Jeopardy Conclusions ............... 3

    B. The Service Was Required to Show that the Easement's Claimed *Effects*–Biological Benefits to the Species–Were Reasonably Certain ................................................. 6

        1. The Service failed to consider the easement's biological effects ................................................. 7

        2. The Service was required to consider how much water would have been pumped absent the easement ............ 10

        3. "Reasonably certain" does not mean "likely." ................ 13

    C. The Service Failed to Demonstrate that Agricultural Irrigation Would Have Occurred Absent the Easement ...... 14

        1. The Service provided no evidence that future irrigation was reasonably certain ................................. 16

        2. The record contradicts the Service's false assumption that agricultural irrigation would occur on the property ......................................................... 18

        3. Even if the easement provided benefits, it did not do so at the scale or time the Service claimed ................... 23

II. THE SERVICE ERRED BY CONCLUDING THAT THE FORT'S PUMPING WOULD NOT JEOPARDIZE THE NORTHERN MEXICAN GARTERSNAKE. ................................................................. 29

    A. The Service erred by reasoning that the gartersnake's

fragile status made it less susceptible to harm.....................30

B.    The record belies the Service's speculation that
gartersnakes would flee to better habitat .............................34

III.   CONCLUSION.........................................................................37

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Bennett v. Spear,*
520 U.S. 154 (1997) .............................................................. 17

*Ctr. for Biological Diversity v. Bernhardt,*
982 F.3d 723 (9th Cir. 2020) .......................................... 6, 7

*Ctr. for Biological Diversity v. Salazar,*
804 F. Supp. 2d 987 (D. Ariz. 2011) .................................. 23

*Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.,*
698 F.3d 1101 (9th Cir. 2012) ..................................... 30, 33

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.,*
441 F. Supp. 3d 843 (D. Ariz. 2020) .................................. 33

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.,*
807 F.3d 1031 (9th Cir. 2015) ............................................ 17

*Ctr. for Biological Diversity v. Zinke,*
900 F.3d 1053 (9th Cir. 2018) ......................... 3, 17, 20, 25

*Gulf Power Co. v. FERC,*
983 F.2d 1095 (D.C. Cir. 1993) .......................................... 18

*Medina Cnty. Env't Action Ass'n v. Surface Transp. Bd.,*
602 F.3d 687 (5th Cir. 2010) ................................................ 9

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto.
Ins. Co.,*
463 U.S. 29 (1983) ...................................................... *passim*

*Nat'l Fuel Gas Supply Corp. v. FERC,*
468 F.3d 831 (D.C. Cir. 2006) ......................................... 5, 6

*Nat'l Wildlife Fed'n v. Coleman,*
   529 F.2d 359 (5th Cir. 1976) ................................................ 9

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.,*
   184 F. Supp. 3d 861 (D. Or. 2016) .................................. 8, 28

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.,*
   524 F.3d 917 (9th Cir. 2008) .............................................. 34

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.,*
   839 F. Supp. 2d 1117 (D. Or. 2011) .................................... 8

*Native Fish Soc'y v. Nat'l Marine Fisheries Serv.,*
   992 F. Supp. 2d 1095 (D. Or. 2014) .................................... 8

*Nw. Coal. for Alternatives to Pesticides v. EPA,*
   544 F.3d 1043 (9th Cir. 2008) ............................................ 21

*Or. Nat. Desert Ass'n v. U.S. Bureau of Land Mgmt.,*
   625 F.3d 1092 (9th Cir. 2010) ............................................ 17

*Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of
   Reclamation,*
   426 F.3d 1082 (9th Cir. 2005) ............................................ 22

*Save Our Cabinets v. U.S. Fish and Wildlife Serv.,*
   255 F. Supp. 3d 1035 (D. Mont. 2017) ................................ 8

*Sierra Club v. Marsh,*
   816 F.2d 1376 (9th Cir. 1987) ............................. 9, 14, 29

*Tenn. Valley Auth. v. Hill,*
   437 U.S. 153 (1978) ........................................................... 29

*Turtle Island Restoration Network v. U.S. Dep't of Com.,*
   878 F.3d 725 (9th Cir. 2017) ......................................... 34, 36

*United States v. Renzi,*
   769 F.3d 731 (9th Cir. 2014) ............................................. 15

iv

*United States v. Renzi,*
  No. 08-cr-00212 (D. Ariz. filed Feb. 21, 2008) ................................... 15

*Wild Fish Conservancy v. Salazar,*
  628 F.3d 513 (9th Cir. 2010) ......................................................... 33, 34

*Wilderness Soc'y v. Wisely,*
  524 F. Supp. 2d 1285 (D. Colo. 2007) ................................................ 10

## Statutes

16 U.S.C. §1536 ...................................................................... 6, 13

## Other Authorities

50 C.F.R. § 402.02 (2014) ........................................................ 13

50 C.F.R. § 402.14 (2014) ........................................................ 13

78 Fed. Reg. 41,500 (July 10, 2013) ........................................ 31, 37

78 Fed. Reg. 41,550 (July 10, 2013) ...................................... 29, 35, 36

86 Fed. Reg. 22,518 (Apr. 28, 2021) ......................................... 33

Adena R. Rissman, *Evaluating Conservation Effectiveness
  and Adaptation in Dynamic Landscapes* L. & Contemp.
  Probs. 145 (2011) .................................................................. 16

The San Pedro River supports a biologically invaluable ecosystem that sustains millions of migratory birds and hundreds of species, many endangered. Though the ecosystem's greatest threat is groundwater pumping, the U.S. Fish and Wildlife Service determined that U.S. Army Fort Huachuca's annual pumping of 3,000 Olympic swimming pools' worth of groundwater would not jeopardize endangered species that depend on the San Pedro River. The linchpin of that conclusion—an alleged net groundwater usage surplus created (on paper) by granting the Fort 2,588 acre-feet per year (afy) of water credits for acquiring an easement that prohibited agricultural irrigation on the Preserve Petrified Forest property—finds no support in the record. To the contrary, the record shows that the easement provided no benefit to the San Pedro because the property's prior owner already removed the infrastructure necessary for irrigation and planned to use the property for real estate development.

The Government tries to defend the Service's conclusion by claiming that an easement conveys maximum water credits regardless of its on-the-ground effects—or lack thereof. That position contradicts the Endangered Species Act, which requires that mitigation measures

provide biological benefits—here, actual water savings—that offset a project's adverse effects and avoid jeopardy. The Service's failure to evaluate whether, how much, and when the Petrified Forest easement generated water savings renders the Biological Opinion (BiOp) arbitrary and capricious.

The Service also erred by concluding that the Fort's pumping would not jeopardize the northern Mexican gartersnake specifically. In reaching that conclusion, it ignored key facts showing that the effects of the Fort's dewatering—reduced recruitment, the loss of ten gartersnakes, and diminished habitat connectivity in a vulnerable, low-density population—could cause local extirpation and increased the risk of extinction. This glaring omission, which the Government fails to address, renders the Service's conclusion irrational and unsupported.

The Court should hold the Service accountable for these significant errors and vacate, set aside, and remand the flawed BiOp.

## I.     THE SERVICE ERRED BY IRRATIONALLY ASSUMING THAT THE FORT WOULD GENERATE A GROUNDWATER SURPLUS.

The Service sidestepped a jeopardy determination by crediting the Fort with a net groundwater surplus based on the Petrified Forest easement. But the facts contradict that claim and reveal that the Fort's

pumping created a massive, persistent groundwater *deficit*.  Dkt. 11,

Appellant's Open. Br. 34–57.

The Government attempts to cover up the Service's error in three

ways.  First, it falsely claims that the Service relied independently on a

groundwater model.  Dkt. 23, Appellee's Answering Br. ("Resp.") 27–41.

Second, it attempts to erase the legal requirement that mitigation

measures provide "reasonably certain" biological benefits.  Resp. 41–49.

And third, it offers improper post-hoc arguments purporting to repair

the Service's unfounded conclusion that the easement would generate

2,588 afy of water savings starting January 1, 2014.  Resp. 49–60.  All

three fail.

## A.  The Service Relied on the Groundwater Demand Accounting to Reach Its No-Jeopardy Conclusions.

The Government attempts to disavow the Service's reliance on the

faulty groundwater accounting, claiming that the Service also relied on

a groundwater model.  Resp. 27–41.  This argument fails because it

contradicts the BiOp, which can only "be upheld, if at all, on the basis

articulated by the agency itself."  *Ctr. for Biological Diversity v. Zinke*,

900 F.3d 1053, 1069 (9th Cir. 2018) [hereinafter *CBD v. Zinke*].

The Service identified the demand accounting as "*the best estimate*

of the Fort's continuing groundwater demands and its contribution (positive or negative) to the sustainable yield of the regional aquifer." 2-ER-0116–17 (emphasis added). And the Service repeatedly relied on that "best estimate," *id.*—and the net surplus it allegedly showed—to offset the Fort's adverse impacts and avoid a jeopardy finding. For example, it concluded that a "surplus" attributable to the Petrified Forest easement would "ensure" that the "adverse effects" of the Fort's pumping would "be of short duration, and more than completely ameliorated." 2-ER-0197; *see also* 2-ER-0313; 2-ER-0331.

The Petrified Forest easement was anything but a "narrow aspect" of this accounting. Resp. 27. The Service claimed a massive water credit for it: 2,588 afy, or roughly 1,300 Olympic swimming pools' worth of water per year. It used those credits to transform the Fort's groundwater *deficit* of 1,495 afy into an alleged *surplus* of 1,419 afy. Open. Br. 13–15. But, as explained in Section I.C, the Service failed to demonstrate that the Petrified Forest easement generated water savings and failed to consider facts that contradicted this assumption.

That failure renders the BiOp arbitrary and capricious. *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S.

29, 43 (1983).  Given this error, the Government must demonstrate that the Service "certain[ly]" would have reached a no-jeopardy conclusion absent the false surplus, i.e., based solely on the groundwater modeling. *Nat'l Fuel Gas Supply Corp. v. FERC*, 468 F.3d 831, 839 (D.C. Cir. 2006).

It does not, and cannot, for two reasons.  First, the BiOp never identified the groundwater model as a stand-alone rationale for the Service's no-jeopardy conclusions.  To the contrary, the BiOp identified multiple shortcomings in the groundwater model, noting that it was "not perfect" and "ha[d] its limitations."  2-ER-0112.  The Service therefore expressly relied on the "groundwater demand accounting methodology, *combined with* the results of the groundwater model," 2-ER-0333 (emphasis added).  The Service did not rely "solely" on the groundwater model, so that cannot be a basis to uphold its decision. *FERC*, 468 F.3d at 839.

Second, the Government mischaracterizes the results of the groundwater model, suggesting that it showed the Fort's pumping would have only a "positive effect" on flows.  Resp. 39–40.  Not so.  The BiOp repeatedly identified *negative* impacts on flows due to the Fort's

pumping. *E.g.*, 2-ER-0207 (showing modeled baseflow decline along the lower Babocomari River); 2-ER-0197 (discussing "adverse effects" on Huachuca water umbel habitat). The Service thus expressly depended on the alleged groundwater surplus created by the Petrified Forest easement to reach no-jeopardy determinations for several species. 2-ER-0197; 2-ER-0313; 2-ER-0331; Open. Br. 14–15. But that accounting was "deficient," rendering the BiOp arbitrary and capricious. *FERC*, 468 F.3d at 839 (holding that a decision is arbitrary and capricious where "at least one" of multiple non-alternative rationales "is deficient").

In short, the Government's post-hoc emphasis of the groundwater model cannot undo the Service's reliance on the flawed accounting.

## B. The Service Was Required to Show that the Easement's Claimed *Effects*—Biological Benefits to the Species— Were Reasonably Certain.

To comply with the Endangered Species Act, the Service was required to "[e]nsure," 16 U.S.C. § 1536, that the Petrified Forest's purportedly mitigating effects "address[ed] the threats to the species in a way that satisfies the jeopardy and adverse modification standards." *Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723, 743 (9th Cir.

6

2020).  As this Court's precedent and the Endangered Species Act regulations make clear, the only way to do so was to show that the easement's claimed effect—water savings to the San Pedro's endangered species—were "reasonably certain" to occur.  *Id.*

The Government attempts to weaken this legal standard in three ways.  First, it argues that only the easement's legal effect matters, not whether it provided any biological benefits.  Resp. 41–44.  Second, it claims that the Service had no duty to consider the counterfactual—how much water would have been pumped without the easement—even though that is the only way to assess whether it provided a benefit.  Resp. 41–44 & n.10.  Third, it asserts that "reasonably certain" means "likely," an approach that contradicts this Court's precedent and the Service's own regulations.  Resp. 42, 44–48.  All three arguments must be rejected.

### 1. The Service failed to consider the easement's biological effects.

The Government argues that only the "mitigation project *itself*" needs to be reasonably certain, not its biological "effects."  Resp. 41–44.  That is wrong as a matter of law.

The Government is correct that mitigation measures are unlawful

where the "mitigation measures . . . *themselves*" are not reasonably certain to occur. Resp. 42–43 (collecting cases). But the Government ignores the extensive caselaw finding mitigation measures inadequate where the claimed *biological effects* were not reasonably certain, even if the measure itself was. *See Native Fish Soc'y v. Nat'l Marine Fisheries Serv.*, 992 F. Supp. 2d 1095, 1113–14 (D. Or. 2014) (BiOp failed to demonstrate measures "would mitigate the problems" even though they were "certain to be implemented"); *Save Our Cabinets v. U.S. Fish and Wildlife Serv.*, 255 F. Supp. 3d 1035, 1063 (D. Mont. 2017) (BiOp unlawful due to "potential inadequacy" of already-implemented measure's efficacy); *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 184 F. Supp. 3d 861, 903–06 (D. Or. 2016) [hereinafter *NWF v. NMFS II*] (concluding that mitigation measures, even if implemented, would not satisfy the Endangered Species Act due to "layers of uncertainty in predicting benefits from habitat improvement"); *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 839 F. Supp. 2d 1117, 1126 (D. Or. 2011) (noting that mitigation measures must be both "feasible *and* effective") (emphasis added). These cases dispose of the Government's attempt to eliminate this requirement.

In fact, the Government concedes that more analysis was required even once "the Army already ha[d] the easement." Resp. 43. In its words, the "question left for the agencies [was] establishing a reasonable estimate of the water savings to attribute to the easement." Resp. 43–44. That is correct: the Service had an obligation to rationally demonstrate, with reasonable certainty, whether, how much, and when the easement generated actual water savings for the San Pedro.[1]

That analysis was required to ensure that the easement generated the biological response necessary to avoid jeopardy. Without it, there was no way to confirm whether—vis-à-vis the certain effects of the Fort's pumping—the easement resulted in sufficient mitigation to avoid a jeopardy finding. *See Sierra Club v. Marsh*, 816 F.2d 1376, 1386 n.13 (9th Cir. 1987) ("It is certain that this project will harm the birds'

---

[1] The involvement of third-party actors does not obviate this requirement. *Contra* Resp. 46–47. To the contrary, the reasonable certainty of third-party actors is commonly part of the analysis. *See, e.g.*, *Medina Cnty. Env't Action Ass'n v. Surface Transp. Bd.*, 602 F.3d 687, 702 (5th Cir. 2010) (holding agency *not* responsible for effects of private development that was not "reasonably certain to occur"); *Nat'l Wildlife Fed'n v. Coleman*, 529 F.2d 359, 373–74 (5th Cir. 1976) (holding agency *was* responsible for private development where evidence showed "private development always accompanies the construction of a major highway").

environment; what is uncertain is whether the harm will be mitigated."); *Wilderness Soc'y v. Wisely*, 524 F. Supp. 2d 1285, 1306 (D. Colo. 2007) ("As the lessee's plans become more specific . . . the degree to which the [agency] must specify its mitigation measures rises as well."). The Service failed to conduct that analysis.

### 2. The Service was required to consider how much water would have been pumped absent the easement.

The only way for the Service to conduct that analysis was by considering how much groundwater would have been pumped absent the easement. Open. Br. 37–40. The Government claims that "the counterfactual scenario . . . does not qualify as 'an effect of the action'" subject to the reasonable certainty standard. Resp. 44 n.10. That assertion defies common sense and must be rejected.

It is axiomatic that a conservation easement results in water savings only if it prevents actual or reasonably certain water use from otherwise occurring. The Service has acknowledged this contingent value, noting that conservation easements "do not result in an increase in flows in adjoining streams *unless an active water use is retired*." 2-ER-0332 (emphasis added). It is undisputed that the Petrified Forest easement did not retire an active water use because irrigation had been

discontinued on the property in 2005, nearly a decade before the easement was conferred.  Resp. 11; 4-ER-0759.  Accordingly, to "establish[] a reasonable estimate" of the Petrified Forest easement's purported water savings, Resp. 44, the Service needed to evaluate whether, how much, and when "new . . . agricultural water uses" would have "increase[d]" absent the easement.  2-ER-0332.  Such assurance of "additionality"— adding benefits beyond what would happen anyway— is fundamental to mitigation under the Endangered Species Act.  Open. Br. 38 n.9.

Indeed, defying the Government's attempt to characterize this approach as novel, the Service *did* evaluate a counterfactual to determine some reasonably certain effects of the Fort's pumping.  It modeled a "With Fort Attributable" scenario and its counterfactual "No Fort Attributable" scenario, and then subtracted the latter from the former to isolate Fort-attributable effects.  4-ER-0755–56; *see also* Resp. 15.  That is what the Service should have done to evaluate the alleged benefits of the Petrified Forest easement: assessed whether, how much, and when pumping would have occurred with and without the easement, and then compared the two scenarios to determine the

easement's net effect—its actual water savings.  But it did not.

Allowing the Service to omit this analysis would invite agencies to abuse easements and claim non-existent water savings.  For example, an agency could claim 2 afy of water credits for an easement prohibiting an Olympic-size swimming pool on a property, even if no one planned to build a pool (of any size).[2]  Allowing the Service to grant water credits with no regard for reality would create a loophole in the Endangered Species Act allowing agencies to escape jeopardy by acquiring easements whose benefits exist only on paper.

The Court can prevent that result by enforcing the law, which requires the Service to ensure with reasonable certainty that any claimed mitigation actually offsets a project's harm.  Requiring agencies to evaluate the counterfactual does not "chill" the use of easements, Resp. 42; it simply ensures that the credits granted align with the actual, biological benefits conferred.  Anything less fails to ensure against jeopardy to species—the bottom-line requirement of the Endangered Species Act.

---

[2] An Olympic swimming pool contains 660,000 gallons of water, roughly 2 afy.

### 3. "Reasonably certain" does not mean "likely."

The Government argues that, instead of reasonable certainty, "all that is required is . . . the agency's judgment about the *likely* effect of the Fort's proposed actions." Resp. 48 (emphasis added). It offers two arguments in support of this watered-down standard, both of which fail.

It first claims, citing 16 U.S.C. § 1536(a)(2), that "the Service's statutory task is to determine the 'likely' effects of agency action, not the certain ones." Resp. 45. However, it misleadingly plucks the word "likely" from that statutory provision, which in fact requires the Service to "[e]nsure" that a project "is not likely to jeopardize" endangered species. 16 U.S.C. § 1536(a)(2). As the regulations make clear, the Service meets that obligation only by assessing all "reasonably certain" effects of the action, including any proposed mitigation measures. 50 C.F.R. § 402.14(g)(3) (2014) (requiring the Service to evaluate all "effects of the action"); *id.* § 402.02 (defining "effects" as "all consequences to listed species or critical habitat" that "would not occur but for the proposed action" and are "reasonably certain to occur"). The Government's effort to rewrite the law and erase the Service's key

statutory obligation—ensuring no jeopardy to listed species—must be rejected.

The Government next falsely claims that the Conservation Groups seek a "heightened standard" of "absolute certainty," "definitive proof," "definite plans," or "incontrovertible proof." Resp. 42–48. This is a strawman. Between the Government's false binary of absolute certainty and mere likelihood lies the true standard: reasonable certainty.

Ultimately, the Government advocates for a near-standardless approach where an agency can avoid jeopardy simply by acquiring an easement on a property, regardless of whether it provides any actual benefit. That approach places all risk on endangered species, forcing them to bear the burden of inadequate or illusory mitigation. That outcome is neither cautious nor rational, and it is directly contrary to the Endangered Species Act, which requires any uncertainty in mitigation "to be borne by the project, not by the endangered species." *Marsh*, 816 F.2d at 1386.

### C. The Service Failed to Demonstrate that Agricultural Irrigation Would Have Occurred Absent the Easement.

The Government acknowledges that agricultural irrigation

ceased in 2005, almost a decade before the Fort acquired the Petrified Forest easement. Resp. 11. But, like the Service, it fails to grapple with any subsequent facts about the property, all of which demonstrate that irrigation was almost certain *not* to occur again.

This oversight is punctuated by its mischaracterization of *United States v. Renzi*, 769 F.3d 731 (9th Cir. 2014). As that case makes clear, the prior owner of the property, James Sandlin, planned to turn the property into a housing development—and that was "*always his contention.*" *See United States v. Renzi*, No. 08-cr-00212 (D. Ariz. filed Feb. 21, 2008), ECF No. 1257, Tr. Philip Aries Test. 184:17–18 (May 16, 2013) (emphasis added).[3] In line with that plan, irrigation ceased, 4-ER-0759; the center-pivot system was removed, 4-ER-0843, 4-ER-0866; and the property was valued at approximately $12 million for the development of 159 four-acre residential lots, Aries Test. 188:14–18.

Against these facts, the Government baldly offers that the Service

---

[3] In 2005, Phillip Aries purchased 480 acres of the Petrified Forest property from Mr. Sandlin. *Renzi*, 769 F.3d at 741. Mr. Aries testified extensively at the *Renzi* trial about Mr. Sandlin's development plans. *See generally* Aries Test. The real-estate market was so "hot" that Mr. Aries received an offer to sell the property for a $700,000 profit. *Id.* at 143:12–144:8; *see also Renzi*, 769 F.3d at 741 n.13.

had "concerns about future agricultural use of the parcel." Resp. 53.

That speculation violated the Endangered Species Act for three reasons.

First, it was unsupported: the Service provided no evidence that future

irrigation was likely, much less reasonably certain, to occur on the

property. Second, it contradicted the record evidence, which showed

that irrigation was almost certain *not* to occur. Third, even if the

easement provided some benefit, it did not do so at the scale or time the

Service claimed.

### 1. The Service provided no evidence that future irrigation was reasonably certain.

The Government observes that "a conservation easement looks

forward." Resp. 53. But the Service never looked forward in its

evaluation of the Petrified Forest property. It did not, for example,

identify any plans for future irrigation. Nor did it assess trends in the

area, such as by conducting a "comparative analysis" of "paired

landscapes." Adena R. Rissman, *Evaluating Conservation Effectiveness*

*and Adaptation in Dynamic Landscapes*, 74 L. & Contemp. Probs. 145,

149 (2011). Thus, the Service's assertion—that irrigation would occur

but for the easement—was not "rationally based on available evidence."

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 807 F.3d 1031, 1050 (9th Cir. 2015).

Like the BiOp, the Government's brief fails to identify any analysis of the property's future use and instead relies solely on speculation. *See* Resp. 45–49. But the Endangered Species Act requires the Service to ground its decision in facts, not "speculation or surmise." *Bennett v. Spear*, 520 U.S. 154, 176 (1997). Thus, as a matter of administrative law, the Service's unsupported conclusions are owed no deference, *contra* Resp. 45, as the Court may not "defer to a void." *Or. Nat. Desert Ass'n v. U.S. Bureau of Land Mgmt.*, 625 F.3d 1092, 1121 (9th Cir. 2010); *see also CBD v. Zinke*, 900 F.3d at 1069.

Furthermore, the Government's excuse is inconsistent with the approach it took elsewhere in the BiOp. For example, the Service concluded that the Fort's groundwater demand would "remain relatively stable in the future," 2-ER-0059, because there was "no evidence of particular people with concrete plans to remain in or move to" the area, Resp. 46. That same logic applies to the Petrified Forest: there were no plans to irrigate the property, and thus the Service

should have concluded that the nearly nonexistent[4] water use would "remain stable." Instead, the Service assumed more than a *thousand-fold increase* in water use (to 2,588 afy) without any evidence of future irrigation. The Service thus selectively relied on contradictory approaches to claim a groundwater surplus where there was none. *See Gulf Power Co. v. FERC*, 983 F.2d 1095, 1101 (D.C. Cir. 1993) ("[W]hen an agency takes inconsistent positions . . . it must explain its reasoning.").

> **2. The record contradicts the Service's false assumption that agricultural irrigation would occur on the property.**

The Service also ignored extensive evidence demonstrating that irrigation was almost certain *not* to occur, undercutting its central assumption.

***First***, the record shows that the Petrified Forest property was going to be developed for residential use, not agricultural irrigation. Residential use requires significantly less water than agricultural irrigation: roughly 0.33 afy per home. *See* 2-ER-0069 (4 afy for 12

---

[4] There was some livestock grazing on the property, 4-ER-0843, which equated to approximately 2.1 afy (685,000 gallons), *see* 4-ER-0902.

homes).  Nonetheless, the Government contends simply that the Fort had an "interest" in the property and thus should get credit for what *it* wanted: maximum water credits for irrigation.  Resp. 53 (citing *Renzi*, 769 F.3d at 739–41).  However, the controlling question is not what the Fort wanted, but whether the property would be used for agricultural irrigation in the future absent an easement.

On that score, there was extensive evidence from the *Renzi* trial confirming that the property was slated for real-estate development.  As the facts showed, Mr. Sandlin was "no longer farming" the property, and so offered an easement "to be paid" for his plans "to develop it." Aries Test. 34:25–35:1.  He was not "giv[ing] up *anything"* in the proposed easement, as he did not have any plans to irrigate the property.  *Id.* at 35:17 (emphasis added).[5]  Mr. Aries' trial testimony could not have been clearer on this point:

---

[5] The Government contends that the "primary value" of the property was in the water rights, Resp. 54, but that post-hoc assertion appears nowhere in the BiOp.  It is also contradicted by Mr. Aries' testimony, which valued each four-acre lot at $80,000, resulting in a total gross value of roughly $12 million.  Aries Test. 186:22–188:18.

Q: Is there a term of art you use for that in the industry?
A: Yeah, double-dipping.
Q: What does that mean?
A. That he [Mr. Sandlin] was trying to get paid for the fact that he was going to convert his land from agriculture to development.

Aries Test. 35:2–8. As such, Mr. Sandlin's proposal "didn't pass the conservation test." *Id.* at 34:3–4. These facts squarely contradict the Service's speculation that the property would be irrigated for agriculture and demonstrate that the Fort's claimed water savings were illusory.

Furthermore, as the Fort acknowledged, Cochise County was experiencing a "major trend" of "increased development that [wa]s simply urbanizing the formerly rural landscape." 4-ER-0881. The Service failed to consider not just this "single page" of evidence, Resp. 53, but the entire 98-page Joint Land Use Study that it came from, which bore directly on the property's future use. The Government cannot cure this oversight with post-hoc characterizations of the study the Service failed to consider. *See CBD v. Zinke*, 900 F.3d at 1068–69 ("[A]n agency's action must be upheld, if at all, on the basis articulated by the agency itself, not post-hoc rationalizations.").

***Second***, the property's irrigation infrastructure had been

removed, which directly contradicts the BiOp's statements that it remained in place. The Service based its assumption that irrigation would commence on "previous agricultural activity" in the form of "four circle-pivot fields planted in alfalfa." 2-ER-0069. And it explicitly claimed that the property could be irrigated in the future because "the entire irrigation infrastructure remain[ed] in place" on the property. *Id.*

That was false. A critical piece of that infrastructure, the center-pivot sprinklers, had in fact been removed, 4-ER-0843, and one of the wells' "distribution system[s]" had been "excavated." 4-ER-0866. These contrary facts do not appear in the BiOp, rendering it "irrational, unclear, [and] not supported by the data it purports to interpret." *Nw. Coal. for Alternatives to Pesticides v. EPA*, 544 F.3d 1043, 1052 n.7 (9th Cir. 2008).

The Government attempts, post-hoc, to obscure the BiOp's erroneous factual statements. First, the Government claims that the Service did not actually base its water credits on future center-pivot irrigation and instead used a 5.4-afy water duty based on a "complete mix of crops and irrigation systems," including flood irrigation. Resp. 52. That explanation appears nowhere in the BiOp. Instead, the BiOp

21

explicitly stated that the easement prevented "circle-pivot" irrigation and, as discussed further in Section I.C.3, based its quantification of water credits on the assumption that the property would be center-pivot-irrigated. 2-ER-0069. The Service cannot now rewrite this explanation. *See Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation*, 426 F.3d 1082, 1091 (9th Cir. 2005) ("[W]hen reviewing a biological opinion, we rely only 'on what the agency *actually said*' in the BiOp to determine whether the agency considered the appropriate factors.").

Furthermore, no water duty applied to the Petrified Forest. The Arizona Department of Water Resources explicitly prohibits assigning a water duty for "discontinued irrigation," meaning "[a]creage that has not been irrigated within the most recent five year period but has been irrigated at least once in the most recent ten year period." FER-0004. This prohibition belies the Service's use of *any* water duty and undermines the Government's position.

At bottom, the evidence contradicts the Service's unfounded assumption that the Petrified Forest property was going to be irrigated in the future at all, much less via center-pivots. The Court should reject

the Service's attempt to grant significant water credits for preventing irrigation that was never going to happen anyway.

### 3. Even if the easement provided benefits, it did not do so at the scale or time the Service claimed.

Assuming that the Petrified Forest easement generated *any* water savings for the San Pedro, the Service miscalculated the (1) scope and (2) timing of the benefits it claimed.

***First***, the Service miscalculated the water savings it granted to the Fort, even under its own assumptions. Failure to support the quantification of a mitigation measure's benefits violates the Endangered Species Act. *See, e.g.*, *Ctr. for Biological Diversity v. Salazar*, 804 F. Supp. 2d 987, 1002 (D. Ariz. 2011) (finding a prior Fort Huachuca BiOp unlawful because it failed to justify and support "the amount of water the conservation measures would save").

The Service here overstated the acreage supposedly saved from irrigation by adding together acreage from four quarter-sections when the easement covered just three. The BiOp assumed that hypothetical future irrigation would consist of "four circle-pivot fields planted in alfalfa," 2-ER-0069, each located within a square, 160-acre quarter section. 4-ER-0856. Because a circle within a square leaves the corners

unirrigated, the Service assumed that 75 percent of "[e]ach field" would be irrigated, meaning "120 ac[res]" for each 160-acre quarter-section, "for a total of 480 irrigated acres." 2-ER-0069.

But the easement did not cover all four quarter sections. Rather, the easement's deed expressly excluded "the [s]outhwest [q]uarter [t]hereof," meaning it covered only three quarter-sections. 4-ER-0840. The Service therefore overstated the purported benefit by 25 percent (480 acres instead of 360 acres), or about 846 afy according to its own formula: 120 acres x 5.4 acre-feet per acre.

The Government attempts to dodge this error by falsely claiming that it was not raised before the district court. Resp. 55–56. It was. ECF No. 39, Tr. Summ. J. Hearing 16:4–19; ECF No. 29, Reply Supp. Mot. Complete Admin. R. 6.[6]

The Government also attempts to obfuscate the Service's faulty calculations with a math trick. It insists that the Service accounted for the excluded quarter-section because the full 640-acre property minus

---

[6] The Fort and Service failed to include the easement deed in the administrative record. The Conservation Groups raised the issue once the agencies disclosed the deed, and again at oral argument.

one 160-acre quarter-section equals 480 acres—the same figure found in

the BiOp. Resp. 56–57. But that is just a convenient coincidence. As

explained above, the Service assumed four fields would be center-pivot

irrigated and calculated 480 acres by adding together four 120-acre

circles. The Government now claims the property could have been

flood-irrigated and adds together three 160-acre squares. That is

simply not how the Service did its math, and the Government's

revisionist math should be rejected. *CBD v. Zinke*, 900 F.3d 1053,

1068–69.

The Government also contends that the Service's math error was

harmless. It asserts that, if the Petrified Forest easement were

assigned water credits based on 360 acres and a water duty of 3.4 acre-

feet per acre[7] (1,224 acre-feet), there would still be "a projected net

surplus of around 400 afy." Resp. 57–58 & n.14.

Not so. The Government makes the same mistake the Service did

---

[7] The water duty of 3.4 acre-feet per acre accounts for return flows, or the water that naturally flows back into the aquifer. The district court found—and the Government does not contest—that the Service should have, but did not, subtract these return flows from the water duty used to calculate credits. Open. Br. 26; 1-ER-0030–32.

in the BiOp: it failed to subtract return flows. As the district court held, the Service failed to subtract return flows from *two* easements: the Petrified Forest easement and the Clinton/Drijvers parcel. *See* 1-ER-0025, -0030–32. Subtracting return flows from the Clinton/Drijvers easement yields a reduction of 397 acre-feet in credits, from 1,073 acre-feet to 676 acre-feet.[8] That reduction (which the Government neglected), combined with the "reduction of 1,368 afy" from calculating the Petrified Forest parcel's water duty and acreage correctly, Resp. 57 n.14, yields a *deficit* of 346 acre-feet in 2014.[9]

That the claimed surplus was actually a deficit is not harmless. It negates, literally, the Service's asserted rationale and demonstrates that it left the San Pedro's endangered species bearing the risk of unaccounted-for harm.

---

[8] 1,073 acre-feet / 5.4 acre-feet per acre x 3.4 acre-feet per acre.

[9] The claimed surplus of 1,419 acre-feet in 2014, reduced by 397 acre-feet for the Clinton/Drijvers easement and 1,368 acre-feet for the Petrified Forest easement, is *negative* 346 acre-feet.

**Second**, the Service identified no basis for crediting the Fort with immediate water savings starting January 1, 2014.[10]  On this point, the Government doubles down on its argument that only an easement's legal, not biological, effects matter.  It claims that granting water credits immediately was permissible because the "legal right" to irrigate "ceased immediately."  Resp. 59.  But, as explained in Section I.B, that approach is wholly out of step with the Endangered Species Act and the very purpose of mitigation: ensuring, with reasonable certainty, the "necessary biological response" that prevents jeopardy.  An easement has no biological benefit—no additionality—if it does not prevent harm that would have otherwise occurred.

Here, there was *no* evidence that irrigation would have commenced in 2014 on the Petrified Forest property but for the easement.  To the contrary, the Service explicitly noted significant "uncertainty in when agricultural pumping would recommence without" the easement, if ever.  2-ER-0192–93; *see also* 2-ER-0332; 4-ER-0735; 4-

---

[10] The Government questions whether the Conservation Groups preserved this issue before the district court.  Resp. 58.  They did.  ECF No. 18, Mot. Summ. J. 44; ECF No. 28, Reply Mot. Summ. J. & Resp. Cross-Mot. Summ. J. 5.

ER-0758–59.  The Service simply pretended that this acknowledged uncertainty did not exist, unlawfully "plac[ing] all of the risk of that uncertainty on the species." *NWF v. NMFS II*, 184 F. Supp. 3d at 906.

Finally, the Government argues that the timing of these credits does not matter because the Service also evaluated the groundwater model.  Resp. 59.  But that contradicts the BiOp, which, as explained in Section I.A, relied on "a 'positive' water budget balance *beginning in 2014*" to disregard modeled adverse impacts to species.  2-ER-0313 (emphasis added); *see also* 2-ER-0197; 2-ER-0198 n.5; 2-ER-0201.  In other words, the Service relied on the accounting to prop up the modeling based explicitly on its fictional assumption that the easement began providing benefits in 2014.  The Government cannot now claim that this assumption did not matter.

In sum, the Service credited the Fort with 2,588 afy of water starting immediately in 2014, simply because it obtained an easement on a property.  It did so with no regard for whether, how much, or when future groundwater pumping would have occurred absent the easement. That fact-free approach placed all risk of inadequate mitigation on the San Pedro's endangered species, which is precisely what the

Endangered Species Act does not permit.  *See, e.g.*, *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 194 (1978); *Marsh*, 816 F.2d at 1386.

## II. THE SERVICE ERRED BY CONCLUDING THAT THE FORT'S PUMPING WOULD NOT JEOPARDIZE THE NORTHERN MEXICAN GARTERSNAKE.

As a "riparian obligate" species, 2-ER-0291, "[t]he presence of water is critical for northern Mexican gartersnakes," 2-ER-0299.  "Of all the activities that may threaten [its] physical habitat, none are more serious than those that reduce flows or dewater habitat over large reaches or locally."  *Id.*  The Service found that the Fort's groundwater pumping would do just that: dry up stretches of the gartersnake's foraging habitat along the lower Babocomari River—which was designated as "critical" and deemed "essential to the conservation of the species."  78 Fed. Reg. 41,550, 41,551, 41,568 (July 10, 2013).  Yet the Service erroneously concluded that this dewatering would not jeopardize the gartersnake, in violation of the Endangered Species Act.  Open. Br. at 57–67.

The Government makes two arguments in the Service's defense. First, it doubles down on the Service's theory that the Fort's destruction of foraging habitat would only minimally impact the species due to its

low densities and otherwise degraded condition.  Resp. 63–64.  Second, it defends the Service's unsupported belief that gartersnakes would simply flee the lower Babocomari River when it became too dry, claiming the contrary evidence is irrelevant.  Resp. 66–68.  Both arguments fail.

### A.  The Service erred by reasoning that the gartersnake's fragile status made it less susceptible to harm.

The Government restates the Service's claim that the Fort's dewatering would not jeopardize the gartersnake because the affected population's "very low densities" and "poor condition," 2-ER-0310, "minimize[d]" the Fort's "adverse[] [e]ffect[s]," 2-ER-0313.  *See* Resp. 63–64.  To support such a conclusion, the Service was required to articulate a "rational connection between the facts found and the choice made." *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 698 F.3d 1101, 1121 (9th Cir. 2012) [hereinafter *CBD v. BLM*]; *State Farm*, 463 U.S. at 43.

It failed to do so.  Instead, it ignored and, worse, flatly contradicted its own biological findings that low-density populations were *highly* susceptible to harms like the Fort's dewatering of the lower Babocomari River—vulnerability that threatened the species as a

whole.  Specifically, the Service found:

- Threats to the gartersnake—especially those that "alter or dewater" its habitat—act "synergistically" and "disproportionately" on "low-density gartersnake populations," heightening their susceptibility to harm.  78 Fed. Reg. 41,500, 41,536, 41,540 (July 10, 2013).[11]

- When gartersnakes "occur at low population densities in the absence of appropriate recruitment, the loss of even a few adults, or even a single adult female, could drive a local population to extirpation."  *Id.* at 41,536.

- Because of the gartersnake's reduction to "scattered, small, and disjunct populations," *any* further "population declines" or "extirpations," including of low-density populations, cause "a reduction in species redundancy and resiliency" and thereby "enhance[] the risk" of the species "going extinct."  *Id.* at 41,536, 41,539–40.

---

[11] This rule was incorporated in the BiOp by reference.  2-ER-0290.

These scientific findings bear directly on the Fort's dewatering of the gartersnake's critical habitat along the lower Babocomari River, which was expected to cause "local recruitment to be very low" and "take" ten gartersnakes from a low-density population. 2-ER-0310; 2-ER-0314. Those effects are *precisely* what the record showed could cause local extirpation, diminish genetic resilience, and, ultimately, heighten the risk of extinction. It was therefore imperative for the Service to consider these facts and draw a "rational connection" between them and its final conclusion. *State Farm*, 463 U.S. at 43. But it did not: the BiOp is silent on these findings.

Tellingly, the Government has no answer, failing, like the Service, to address these key biological facts. While it summarily declares that the BiOp evaluated the "range-wide survival and recovery needs of the species and the role of the action area" in providing those needs, and that the Service "expressly considered the concerns raised" by the Conservation Groups, Resp. 70–71 (citing 2-ER-0142–43; 2-ER-0312–

13), it does not so much as mention the scientific findings listed above.[12]

This fatal omission means the Service "entirely failed to consider an important aspect of the problem," rendering the BiOp incomplete, unsupported, and irrational. *CBD v. BLM*, 698 F.3d at 1109; *see also Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 529 (9th Cir. 2010) (rejecting a no-jeopardy conclusion that failed to account for potential species-level effects in a fragile species). These unconsidered facts also indicate that the Fort's pumping may have pushed the gartersnake closer to, or over, a "tipping point" for its survival and recovery—undermining the Service's contrary conclusion, 2-ER-0313. *See Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 441 F. Supp. 3d 843, 858–59 (D. Ariz. 2020); Open. Br. 64 n.15.

The Service's factual oversight compounds its erroneous approach of downplaying adverse impacts by contrasting them against the gartersnake's degraded baseline—its "poor condition." 2-ER-0310; *see*

_____

[12] The Government also mistakenly claims that gartersnakes were last detected along the Babocomari River in 1986. Resp. 67, 70. They were detected there at least as recently as 2009. 86 Fed. Reg. 22,518, 22,542 (Apr. 28, 2021). And, regardless, the BiOp determined that the lower Babocomari was "occupied by the species." 2-ER-0304.

Open. Br. 60–63. This Court has repeatedly held that such reasoning—evaluating the effects of an action "compared to" rather than "added to" baseline conditions—is unlawful. *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 929–30 (9th Cir. 2008); *see also Turtle Island Restoration Network v. U.S. Dep't of Com.*, 878 F.3d 725, 738 (9th Cir. 2017) (finding agency "improperly minimized" adverse impacts by "comparing the effects of the [action] against the baseline conditions that have already contributed to the [species'] decline"); *Wild Fish*, 628 F.3d at 528.

That unlawful approach was even more irrational here, where the (unconsidered) facts showed that the gartersnake's degraded baseline made it *more* susceptible to harm, not less. It was therefore wholly unreasonable for the Service to claim that the gartersnake's weakened conditions *lessened* the significance of the Fort dewatering its critical habitat. The Court should remand the BiOp for the Service to consider these unevaluated facts and assess the true impact of the Fort's pumping on a species ill-positioned to weather further harm.

## B. The record belies the Service's speculation that gartersnakes would flee to better habitat.

The Government also defends the Service's proffered explanation

that gartersnakes would "attenuate" the anticipated harm by simply "mov[ing]" "~10 km" away to "more suitable" habitat. 2-ER-0310–11; *see* Resp. 66–68. Dispositive to this issue, the Service provided no scientific support for its "belie[f]" that gartersnakes could respond to dewatering of essential habitat by moving 10 kilometers away. 2-ER-0310–11 (citing no scientific studies or other sources for this proposition). It is the Service's obligation to support and explain its findings, so its failure to do so renders the conclusion arbitrary and capricious. *See State Farm*, 463 U.S. at 44 (holding agency findings must be supported by "substantial evidence on the record").

Even setting aside the Service's failure to support its conclusion, its assumption is contradicted by scientific studies in the record showing that gartersnakes move only "hundreds of meters" from aquatic habitat. 78 Fed. Reg. at 41,554; *see* Open. Br. at 59–60. The Government asserts that this evidence does not undermine the Service's assumption because those studies were about gartersnakes' movement "*laterally* away from water," not "linearly along" it. Resp. 66. But, in addition to being post-hoc, this argument misses the point: the Fort's pumping was expected to *dewater* a lengthy stretch of river—roughly 10

miles (16 kilometers)[13]—causing flows to "become too slight or temporarily disappear" in that reach.  2-ER-0310.  In other words, due to the Fort's pumping, there would no longer be a contiguous stretch of water for gartersnakes to move linearly along.  Which raises the critical question: when the river ran dry, how far could gartersnakes flee, in *any* direction?  The only scientific evidence in the record quantifying gartersnakes' movement indicated that they travelled just "hundreds of meters" from water, 78 Fed. Reg. at 41,554—orders of magnitude less than what the Service assumed.[14]  The Service "may not reject the 'best scientific data' in favor of its belief."  *Turtle Island*, 878 F.3d at 738.

The Government's other argument—that gartersnakes could surely leave the lower Babocomari given that they had previously immigrated there, Resp. 67—misses the same key point.  Past immigration along a flowing river corridor says little about emigration

---

[13] "[F]rom Highway 90 to the confluence of the San Pedro River."  4-ER-0768.

[14] The Government points, post-hoc, to references of gartersnakes being detected at "semi-remote livestock tanks and spring sources."  Resp. 66.  But those references did not quantify distances from flowing water or explain what "semi-remote" meant.  78 Fed. Reg. at 41,554.

along a dewatered one.  In fact, the Government's flawed argument underscores the core ecological problem: the species' viability "is threatened when . . . the length or area of dewatered zones is too great for dispersing individuals to overcome."  78 Fed. Reg. at 41,536.  The only evidence in the record indicated that the distance gartersnakes would need to disperse *was* too large to overcome, rendering the Service's contrary conclusion arbitrary and capricious.

## III.  Conclusion

For the foregoing reasons, the Court should vacate and set aside the BiOp, and remand it with instructions for the Service to remedy these errors.

Respectfully submitted this 3rd day of February 2023.

<div style="margin-left: 40%">

*/s/ Stuart Gillespie*
Stuart Gillespie
Heidi McIntosh
Thomas Delehanty
Earthjustice
633 17th Street, Suite 1600
Denver, CO  80202
Phone: (303) 623-9466
Fax: (720) 550-5757
sgillespie@earthjustice.org
hmcintosh@earthjustice.org
tdelehanty@earthjustice.org

</div>

*Counsel for Plaintiffs-Appellants*
*Center for Biological Diversity,*
*Sierra Club, Grand Canyon Chapter*
*& Maricopa Audubon Society*

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)**  22-15809

I am the attorney or self-represented party.

**This brief contains**  6,983  **words,** including  0  words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated _____.

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**  /s/Stuart Gillespie  **Date** 2/3/2023
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**                                                                 *Rev. 12/01/22*